

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Maranello, Inc.<br><br>    Peticionarios<br><br>Bird Interplan Development Group, LLC<br><br>    Peticionarios<br><br>        v.<br><br>Oficina de Administración de los Tribunales<br><br>    Recurrida | Certiorari<br><br>2012 TSPR 144<br><br>186 DPR ____ |

Número del Caso: CC-2011-0892
                CC-2011-0895

Fecha: 26 de septiembre de 2012

Tribunal de Apelaciones:

        Región Judicial de San Juan, Panel I

CC-2011-892

Abogados de la Parte Peticionaria:

        Lcda. Maileidy A. Gómez Germán
        Lcdo. Adrián Sánchez Pagán

Abogados de la Parte Recurrida:

        Lcdo. Edwin Vélez Collazo
        Oficina de Administración de los Tribunales

        Lcdo. Alberto O. Jiménez Santiago
        Oficina de Administración de los Tribunales

        Lcdo. Carlos Santiago Tavarez
        Lcdo. Manuel D. Herrero
        Lcdo. José A. Sánchez Álvarez

<u>**CC-2011-895**</u>

Abogados de la Parte Peticionaria:

        Lcdo. Juan A. Marchand Quintero
        Lcdo. Charles a. Rodriguez
        Lcdo. Carlos A. Rodríguez

Abogados de la Parte Recurrida:

        Lcdo. Edwin Vélez Collazo
        Oficina de Administración de los Tribunales

        Lcdo. Alberto O. Jiménez Santiago
        Oficina de Administración de los Tribunales

        Lcdo. Carlos Santiago Tavarez
        Lcdo. Manuel D. Herrero

        Lcdo. José A. Sánchez Álvarez


Materia: Sentencia y Opinión Disidente


Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Maranello, Inc.

Peticionarios

Bird Interplan Development
Group, LLC

Peticionarios

v.

Oficina de Administración
de los Tribunales

Recurrida

Certiorari

CC-2011-0892
CC-2011-0895

SENTENCIA

En San Juan, Puerto Rico, a 26 de septiembre de 2012.

Los peticionarios, Maranello, Inc. y Bird Interplan Development Group, LLC, mediante recursos de *certiorari* presentados separadamente nos solicitan que revisemos la sentencia emitida el 31 de agosto de 2011 por el Tribunal de Apelaciones. En virtud de este dictamen, el foro apelativo intermedio confirmó y revocó en parte una determinación de la Oficina de Administración de los Tribunales (O.A.T.), que estableció el orden de preferencia entre nueve propuestas presentadas para la negociación y el desarrollo de un nuevo Centro Judicial en Aibonito.

Los argumentos planteados por las partes tienen su origen en el orden de preferencia adjudicado por la O.A.T. a los licitadores que respondieron a su "Request for Proposal" (*RFP*) para la construcción de las nuevas facilidades del Centro Judicial de Aibonito. En esencia, debemos resolver si el orden de preferencia establecido por la O.A.T., según su *expertise*, respondió a un ejercicio razonable de discreción.

Por entender que así lo hizo, confirmamos la determinación del Tribunal de Apelaciones.

I

La O.A.T. publicó un anuncio, el 26 de abril de 2009, mediante el cual extendió una invitación a las firmas y proponentes interesados para desarrollar, construir y arrendar con opción a compra un nuevo edificio para albergar las instalaciones físicas del Centro Judicial Regional en el Municipio de Aibonito. En el *RFP* se detallaron los requisitos y elementos básicos que debían incluirse en las propuestas. También se desglosaron los criterios para evaluar los proyectos.

Entre los criterios se incluyeron aspectos tales como: que el terreno debía tener acceso a la transportación pública y a las vías principales que conectan los municipios que componen la Región Judicial de Aibonito. Además, se requirió que tuviera la capacidad de albergar el nuevo centro judicial y dos estacionamientos, uno para

empleados y otro para visitantes, con salidas y entradas independientes. También se solicitaron estacionamientos para los jueces y juezas, y otros espacios de estacionamientos para los vehículos oficiales. El terreno debía contar con cabida adicional para una futura ampliación del edificio principal.

En cuanto al diseño y estructura del centro judicial, se requirió un área neta utilizable de 110,000 pies cuadrados. Otro requisito era que la estructura debía construirse en hormigón reforzado o combinado, con acero estructural. Además, se requirió que se incluyera la infraestructura necesaria para que se considerara como un "edificio inteligente", entre otras especificaciones relacionadas con la entrada privada para los jueces, confinados, seguridad, ascensores, sistemas de acondicionadores de aire, alumbrado y otros requisitos para los espacios interiores del edificio y del estacionamiento.

Los licitadores STZ, Maranello, Bird y Roig, fueron cuatro de los nueve proponentes que participaron en el proceso de subasta informal. Los otros proponentes fueron: Judicial Center Development Group (Judicial Center), Aibonito Building & Development, Corp. (Aibonito Building), ASOMA Development, Inc. (ASOMA), BluPoint Development & Construction Management, Inc. (BluPoint), y NORAVI Developers, Inc. (NORAVI).

La Directora Administrativa de los Tribunales, la Jueza Sonia I. Vélez Colón, nombró a un Comité Evaluador para que analizara las propuestas sometidas y emitiera sus recomendaciones. El Administrador de la División de Locales y Servicios Especiales de la O.A.T., Ing. José F. Moreno Navarro, presidió el Comité Evaluador que estaba compuesto por varios directores de la O.A.T. y otros funcionarios de la Rama Judicial. Además, la O.A.T. contrató al ingeniero Ángel Herrera Blanco como consultor externo.

El ingeniero Herrera sometió un extenso y detallado informe en el cual evaluó los aspectos técnicos y especificaciones de cada una de las propuestas. En el informe se detallaron los 10 criterios utilizados para evaluar cada una de las propuestas conforme a las especificaciones del RFP. Los criterios de evaluación utilizados por el Comité Evaluador fueron los siguientes:

1. Ubicación o localización del terreno;

2. Amplitud o tamaño del terreno;

3. Calidad y funcionalidad del terreno;

4. Certificación del edificio como "Green Building";

5. Uso de materiales de primera calidad;

6. Calidad y funcionalidad en el estacionamiento para funcionarios y público;

7. Tiempo de construcción;

8. Monto del canon de arrendamiento;

9. Historial del cumplimiento del desarrollador en otros proyectos similares realizados; y

10. Estructura Administrativa y Recursos del Programa de Mantenimiento.

El Comité Evaluador asignó una escala de valoración del 1 al 10 en cada criterio. La metodología del estudio consistió en el análisis técnico de cada una de las propuestas y su comparación con el cumplimiento de las especificaciones del *RFP*. Incluyó, además, un resumen de cada propuesta, un análisis comparativo de los 10 criterios evaluados y los resultados de la evaluación. También se coordinaron varias visitas a los terrenos propuestos y se consultaron los mapas de zonificación del Municipio de Aibonito, entre otros documentos. En el informe se incluyó una fotografía aérea que ilustró la ubicación de los terrenos propuestos. Además, se incorporó una tabla con el resumen de las evaluaciones y el total de los puntos que cada proponente obtuvo en los 10 criterios que se analizaron.

La O.A.T. adoptó los resultados del Informe de Evaluación Técnica y notificó el siguiente orden de preferencia:

      (1)    STZ (82 puntos)

      (2)    Bird (76 puntos)

      (3)    Maranello (75 puntos)

      (4)    Roig (73 puntos)

      (5)    Aibonito Building (67 puntos)

(6)    BluPoint (63 puntos)

(7)    Judicial Center (61 puntos)

(8)    ASOMA (54 puntos)

(9)    NORAVI (53 puntos)

Inconforme con la puntuación obtenida, Maranello (tercero en la lista de preferencia), Bird (segundo) y Roig (cuarto) solicitaron la reconsideración del orden de preferencia. No obstante, Roig fue el único proponente que no prestó la fianza que se requería para solicitar la reconsideración del dictamen conforme al "Reglamento de Subastas Formales de Bienes y Servicios de la Rama Judicial", vigente desde el 1 de julio de 2003.

Las tres solicitudes de reconsideración se refirieron a la Oficina de Asuntos Legales de la O.A.T. para su evaluación. El Comité Evaluador emitió dos informes en el proceso de reconsideración. Ambos informes analizaron los argumentos de los tres proponentes en torno a las puntuaciones que se les asignaron en cada uno de los criterios impugnados. Los tres proponentes cuestionaron las alegadas deficiencias de la propuesta de STZ.

En síntesis, se cuestionó la puntuación que obtuvo STZ en los criterios de localización del terreno, amplitud o tamaño del terreno, espacio adicional para expansión del edificio y ciertos aspectos relacionados con la calidad y funcionalidad del diseño. También se cuestionó el resultado de la evaluación de las propuestas en el criterio de "Green Building", el espacio de

estacionamiento, el monto del canon de arrendamiento y las puntuaciones que se asignaron en el criterio del historial de cumplimiento de los desarrolladores en proyectos similares.

La Oficina de Asuntos Legales de la O.A.T. acogió las recomendaciones del Comité Evaluador y emitió un informe. Concluyó que la evaluación del Comité Evaluador fue razonable y se fundamentó en los documentos que forman parte del expediente administrativo. Según el informe, ninguna de las 9 propuestas que se recibieron cumplió estrictamente con todos los requisitos establecidos en el RFP, pero la mayoría de ellas cumplió con los requisitos fundamentales. Determinó que el Comité Evaluador utilizó su discreción y evaluó las propuestas a base de un análisis comparativo con los 10 criterios del RFP. Las puntuaciones reflejaron el nivel de cumplimiento de cada propuesta con los criterios establecidos.

Empero, la Oficina de Asuntos Legales reconsideró las puntuaciones que se asignaron en los siguientes criterios: (1) Certificación del edificio como "Green Building", (2) Historial de cumplimiento. Como resultado de la reconsideración, Bird bajó del segundo al cuarto lugar en la lista de preferencias, mientras que Roig ascendió del cuarto al segundo lugar.

La O.A.T. acogió las recomendaciones de la Oficina de Asuntos Legales y, el 23 de diciembre de 2010, notificó un

nuevo orden de preferencia en la negociación del proyecto. El orden fue el siguiente:

    (1)       STZ (82 puntos)

    (2)       Roig (77 puntos)

    (3)       Maranello (76 puntos)

    (4)       Bird (75 puntos)

    (5)       Aibonito Building (67 puntos)

    (6)       BluPoint (63 puntos)

    (7)       Judicial Center (61 puntos)

    (8)       ASOMA (54 puntos)

    (9)       NORAVI (53 puntos)

Inconformes, Maranello y Bird presentaron recursos de revisión ante el Tribunal de Apelaciones en los cuales solicitaron que se revisara el orden de preferencia adjudicado por la O.A.T. Ambos licitadores alegaron que le corresponde el primer lugar para la negociación del proyecto.

Maranello señaló que el Comité Evaluador actuó arbitrariamente al asignar los porcentajes en los criterios que se evaluaron. Según sus argumentos, solo se asignó un 10% en la evaluación del criterio del precio del canon de arrendamiento, lo que ocasionó que la O.A.T. escogiera una propuesta más costosa que la suya.

En segundo lugar, Maranello planteó que la O.A.T. tenía que descalificar a los proponentes que no cumplieron con los requisitos básicos del RFP. Indicó que 6 de los 9 proponentes, incluyendo a STZ y Roig, no proveyeron un

espacio para la expansión o crecimiento futuro del nuevo Centro Judicial de Aibonito. Por otro lado, señaló que procede la descalificación de STZ, ya que entiende que en su propuesta se omitió información indispensable. Por último, Maranello señaló varios errores relacionados con las puntuaciones que la O.A.T. asignó en 7 de los 10 criterios que se evaluaron.

Bird, por su parte, impugnó que se le colocara en el cuarto lugar en el orden de preferencia. Primero, alegó que Roig no prestó la fianza en reconsideración requerida por el Reglamento de Subastas, por lo que la O.A.T. erró al acoger su moción de reconsideración. También planteó que su propuesta fue la que mejor cumplió con los requisitos del RFP y cuestionó las puntuaciones que se asignaron en 6 de los 10 criterios que se evaluaron.

Roig, por su parte presentó un *Alegato en Oposición* en el cual cuestionó las puntuaciones que se asignaron en varios de los criterios del RFP. Bird solicitó la desestimación del alegato de Roig, por entender que era realmente un recurso de revisión que fue presentado tardíamente.[1]

Luego de analizar el voluminoso expediente, el Tribunal de Apelaciones dictó sentencia y resolvió, en primer lugar, no considerar los argumentos de Roig. Determinó que

---

[1] El 3 de mayo de 2011, el Tribunal de Apelaciones emitió una resolución en la que señaló que el asunto sobre la desestimación del alegato de Roig se atendería en la sentencia sobre los recursos de revisión previamente consolidados.

dicha parte no podía traer en oposición lo que no había presentado en un recurso de revisión. Por lo tanto, el foro apelativo se limitó a considerar los argumentos en oposición que se relacionaban con los errores señalados en los recursos de Maranello y Bird.

Por otra parte, el Tribunal de Apelaciones determinó que había cometido error la O.A.T. al cambiarle las puntuaciones a Roig porque esta no cumplió con las disposiciones reglamentarias que requerían depositar una fianza. Por lo tanto, modificó el orden de preferencia en virtud de la puntuación que le corresponde a Roig. De esta forma, el orden de preferencia para la negociación del proyecto de construcción del Centro Judicial de Aibonito es el siguiente:

1.      STZ (82 puntos)

2.      Maranello (76 puntos)

3.      Bird (75 puntos)

4.      Roig (73 puntos)

5.      Aibonito Buildind (67 puntos)

6.      BluPoint (63 puntos)

7.      Judicial Center (61 puntos)

8.      ASOMA (54 puntos)

9.      NORAVI (53 puntos).

Tanto Bird como Maranello presentaron mociones de reconsideración, las cuales fueron denegadas mediante

resoluciones emitidas el 28 septiembre de 2011 y notificadas el 5 de octubre de 2011.

Inconforme con lo resuelto, Bird presentó el recurso CC-2011-0892 y plantea los siguientes errores:

> **Erró el Tribunal de Apelaciones al confirmar la determinación de la OAT, quien actuó de manera irrazonable, arbitraria y caprichosa al colocar a Bird-Interplan en el tercer lugar en el Orden de Preferencia de la Negociación aún [sic] cuando cumplió con los requisitos y criterios de evaluación.**

> **Erró el Tribunal de Apelaciones al confirmar la determinación de la OAT de adjudicar a STZ Development, Corp. el primer [lugar en el] Orden de Preferencia en la Negociación concediendo una puntuación mayor o similar a la de Bird-Interplan en renglones en que STZ no fue responsivo o era inferior a la propuesta de Bird-Interplan.**

Por su parte, Maranello esboza en el recurso CC-2011-0895 los siguientes señalamientos de error:

> **Erró el [Tribunal de Apelaciones] al confirmar que actuó correctamente el Comité Evaluador al asignar porcentuales y/o pesos a los distintos criterios de evaluación.**

> **Erró el [Tribunal de Apelaciones] al confirmar que actuó correctamente la OAT al no haber descalificado a aquellos postores que no cumplieron con uno de los "requisitos básicos de más importancia", el de "proveer espacio para expansión o crecimiento futuro en área utilizable y facilidades".**

> **Erró el [Tribunal de Apelaciones] al concluir que la OAT tenía discreción para aceptar una propuesta que incluía un diseño estructural prohibido en el RFP y que incumple con la reglamentación de seguridad; razón por la que debía haber sido descalificada.**

> **Erró el [Tribunal de Apelaciones] al haber concluido que actuó correctamente la OAT al no haber descalificado la propuesta de STZ en tanto no fue responsiva.**

**El Comité evaluador actuó en forma arbitraria y caprichosa al adjudicar la puntuación que dio lugar a adjudicación de la subasta.**

La O.A.T. presentó un *Memorando Consolidado en Oposición a Expedición de Autos* (en adelante, "Memorando de la O.A.T.) en el que sostiene que este Tribunal debe declarar no ha lugar las peticiones de *certiorari* de Bird y Maranello. Por su parte, STZ presentó memorandos en oposición a que se expida el auto de *certiorari* en ambos recursos. Atendidos los referidos petitorios, ordenamos la consolidación de los casos CC-2011-0892 y CC-2011-0895 y acordamos expedir.

Contando con el beneficio de sus comparecencias, procedemos a resolver.

II

*A. El Mecanismo del Request for Proposal (RFP)*

Es harto sabido, que los procedimientos de las subastas gubernamentales están revestidos del más alto interés público y aspiran a promover la sana administración gubernamental. Caribbean Communications v. Pol. De P.R., 176 D.P.R. 978, 994 (2009); Marina Costa Azul v. Comisión, 170 D.P.R. 847, 854 (2007). El procedimiento de subasta para lograr la adquisición de bienes y servicios evita el favoritismo, la corrupción, la extravagancia y el descuido al otorgarse contratos. Aut. Carreteras v. CD Builders Inc., 177 D.P.R. 398, 404 (2009); Accumail P.R. v. Junta Sub. A.A.A., 170 D.P.R. 821, 827 (2007); Mar-Mol Co., Inc. v. Adm. Servicios Gens., 126 D.P.R. 864, 871 (1990).

Aunque el gobierno debe procurar que las obras públicas se realicen al precio más bajo posible, existen otros criterios, además del precio, que tienen que ser evaluados por la Junta de Subastas al momento de adjudicarla. C. Const. Corp. v. Mun. de Bayamón, 115 D.P.R. 559, 562-563 (1984). Algunos de estos factores incluyen que las propuestas sean conforme a las especificaciones de la agencia, la habilidad del postor para realizar y cumplir con el contrato, la responsabilidad económica del licitador, y su reputación e integridad comercial, entre otros factores. Id., pág. 563.

Las consideraciones de orden público como los servicios o productos técnicos, la probabilidad de realizar la obra de manera más eficiente y dentro del tiempo acordado, y los materiales que ofrezca un postor de la propuesta que no es la más económica, pueden llevar a la agencia a seleccionarlo, si ello corresponde a sus mejores intereses. Caribbean Communications v. Pol. de P.R., supra, pág. 1007; Empresas Toledo v. Junta de Subastas, 168 D.P.R. 771, 779 (2006).

Aunque la subasta formal es el método tradicional para regular la adquisición de bienes y servicios, se ha validado, como alternativa, la compra negociada y el mecanismo de requerimiento de propuestas o "Request for Proposal" (RFP) cuando se trata de bienes o servicios especializados que involucran aspectos altamente técnicos y complejos, o cuando existen escasos competidores

cualificados. Caribbean Communications v. Pol. de P.R., supra, pág. 996; R&B Power v. E.L.A., 170 D.P.R. 606, 621-622 (2007).

El mecanismo de propuestas se destaca por su mayor informalidad y flexibilidad, así como por el grado de discreción que se el confiere a la entidad pública en la consideración de la propuesta recibida, en comparación con la subasta tradicional. R&B Power v. E.L.A., supra, pág. 623. Además, a diferencia del procedimiento formal de subasta, el *RFP* permite la compra negociada y confiere a los licitadores la oportunidad de revisar y modificar sus ofertas antes de la adjudicación de la buena pro. Id., pág. 621.

Por otro lado, contrario al proceso de una subasta formal en el que se someten las propuestas selladas, el *RFP* admite preguntas y sugerencias de parte de los licitadores para delinear una propuesta que se ajuste a las necesidades particulares de la agencia. Se trata de un proceso de negociación entre la agencia y aquellos licitadores que cuentan con mayor grado de conocimiento especializado en el servicio requerido.

Aunque el procedimiento de subasta formal y el requerimiento de propuestas son distintos, no son totalmente incompatibles. El *RFP*, por ser un mecanismo alterno al procedimiento tradicional, necesariamente participa de alguna de las características de la subasta formal. Específicamente, al igual que la subasta formal el

requerimiento de propuestas está sujeto a los requisitos de notificación, así como los procedimientos de reconsideración y revisión judicial contenidos en la Ley de Procedimiento Administrativo Uniforme, Ley Núm. 170 del 12 de agosto de 1988, 3 L.P.R.A. sec. 2101 (L.P.A.U.). Caribbean Communications v. Pol. de P.R., supra, pág. 998.

B. *La revisión judicial de las determinaciones de la O.A.T.*

En virtud de la Ley Núm. 345-2000, 4 L.P.R.A. 24(j), la Asamblea Legislativa facultó al Juez Presidente del Tribunal Supremo o a la Directora Administrativa de los Tribunales, por delegación de este, para adquirir bienes y servicios "de la forma que considere más efectiva, eficiente y necesaria en beneficio de la Rama Judicial". Artículo 1(a) de la Ley núm. 345, *supra*.[2]

De acuerdo con la autoridad conferida, se aprobó el *Reglamento de Subastas Formales de Bienes y Servicios de la Rama Judicial*, mediante el cual se estableció un procedimiento uniforme para llevar a cabo la adquisición de bienes y servicios en la Rama Judicial, la evaluación de las propuestas de los licitadores, la adjudicación de subastas y el ingreso de suplidores en el Registro, entre otros aspectos pertinentes al proceso.

---

[2] Esta ley no está codificada en L.P.R.A., pero aparece como una nota en la sección "Disposiciones Especiales" en el Historial de la Sección 24j de 4 L.P.R.A. Véase la ley íntegra en el Apéndice del Memorando de la O.A.T., págs. 665-666.

En relación con el proceso de la compra negociada y la adquisición de bienes o servicios especializados y complejos, el Art. XXIV (5) del Reglamento de Subastas dispone, en lo pertinente:

> (5) Proceso de negociación
>
> El Comité Evaluador remitirá al director Administrativo sus recomendaciones y el orden de negociación establecido. El Director Administrativo nombrará un Comité de Negociación, designando a uno de ellos como presidente, o delegará en la junta de subastas el efectuar la negociación correspondiente.
>
> La negociación se iniciará con el licitador designado en el primer lugar. Si no se llega a un acuerdo favorable se continuará la negociación con el suplidor designado en segundo lugar y así sucesivamente. Cuando se llegue a un acuerdo favorable para la Rama Judicial, se emitirá una notificación de adjudicación. Si la negociación la llevó a cabo el Comité de Negociación, el Presidente del Comité de Negociación emitirá la notificación de adjudicación.
>
> Si la negociación la efectuó la Junta de subastas, el Secretario de la Junta emitirá la notificación de adjudicación. En ambos casos la adjudicación se notificará a todos los suplidores que participaron y al Jefe de Compras.
>
> El Comité de Negociación preparará un informe de cada negociación efectuada con cada uno de los suplidores seleccionados. Dichos informes formarán parte del expediente de la compra negociada.
>
> Si no se llegara a un acuerdo con los suplidores seleccionados, se procederá con la compra en mercado abierto. [3]

Se ha establecido que el procedimiento a seguir para la revisión judicial de las determinaciones administrativas de la Rama Judicial es "similar al que es utilizado cuando

---

[3] Véase, Apéndice del Memorando de la O.A.T., pág. 701.

el tribunal, actuando como foro apelativo, revisa la corrección o incorrección de la sentencia emitida por un tribunal inferior o la decisión de un organismo administrativo". Rivera v. Dir. Adm. Trib., 144 D.P.R. 808, 821-822 (1988).

Al igual que otras decisiones administrativas, las determinaciones de la O.A.T. gozan de una presunción de legalidad y corrección. Com. Seg. V. Real Legacy Assurance, 179 D.P.R. 692, 716-717 (2010). En el contexto de las subastas gubernamentales la norma general es que la Junta de Subastas de la agencia goza de amplia discreción en la evaluación de las propuestas sometidas ante su consideración. Caribbean Communications v. Pol. de P.R., supra, pág. 1006; Accumail P.R. v. Junta Sub. A.A.A., 170 D.P.R. 821, 828-829 (2007).

De ordinario, la agencia u organismo público es quien posee una vasta experiencia y especialización que la colocan en mejor posición que el foro judicial para seleccionar el postor que más convenga al interés público. Id; Empresas Toledo v. Junta de Subastas, supra, pág. 783; Fac. C. Soc. Aplicadas, Inc. v. C.E.S., 133 D.P.R. 521, 533 (1993).

Una vez se adjudique la buena pro, los tribunales no deben sustituir el criterio de la agencia o junta concernida, a menos que se demuestre que la decisión se tomó de forma arbitraria o caprichosa, o que medió fraude o mala fe. Caribbean Communications v. Pol. de P.R, supra,

pág. 1006; Torres Prods. v. Mun. Aguadilla, 169 D.P.R. 886, 898 (2007). En ausencia de estos elementos, "ningún postor tiene derecho a quejarse cuando otra proposición es elegida como la más ventajosa. La cuestión debe decidirse a la luz del interés público". Great American Indemnity v. Gobierno de la Capital, 59 D.P.R. 911, 916 (1942). En estos casos, la determinación de la agencia será sostenida si cumple con el criterio de razonabilidad. Accumail P.R. v. Junta Sub. A.A.A., supra, pág. 829.[4]

Por otro lado, la revisión de subastas es limitada y se rige por principios similares a los que gobiernan la revisión de los procedimientos celebrados ante las agencias, aunque la Ley de Procedimiento Administrativo Uniforme, supra, no les aplique. Caribbean Communications v. Pol. De P.R., supra, pág. 1006. Es decir, la facultad revisora de los foros apelativos se limita a determinar si la agencia actuó arbitraria, ilegalmente, o de manera tan irrazonable que su actuación constituyó un abuso de discreción. Cruz v. Administración, 164 D.P.R. 341, 355 (2005).

Analizado el marco jurídico aplicable al caso de autos, procedemos a resolver.

III

Para facilitar la discusión de los errores que se incluyeron en los recursos consolidados, atendemos de

---

[4] Véanse, además, Otero v. Toyota, 163 D.P.R. 716, 727 (2005); Pacheco v. Estancias de Yauco, 160 D.P.R. 409, 432 (2003); Rivera Concepción v. A.R.P.E., 152 D.P.R. 116, 122 (2000).

forma conjunta los errores relacionados con la evaluación de los criterios del *RFP* señalados por Bird y Maranello. Como parte de su determinación, el Tribunal de Apelaciones incluyó en su sentencia las puntuaciones que se asignaron a los proponentes que ocuparon la primera, segunda, tercera y cuarta posición en el orden de preferencia según los 10 criterios del RFP. La puntuación es la siguiente:

| Criterios | STZ | Roig | Maranello | Bird |
|---|---|---|---|---|
| Ubicación o localización del terreno | 9 | 6 | 2 | 8 |
| Amplitud o tamaño del terreno | 8 | 9 | 10 | 10 |
| Calidad y funcionalidad en el diseño y construcción | 9 | 7 | 8 | 5 |
| Certificación del edificio como "Green Building" | 4 | 8 | 7 | 7 |
| Uso de materiales de primera calidad | 10 | 9 | 9 | 10 |
| Calidad y funcionalidad del estacionamiento | 10 | 7 | 9 | 10 |
| Tiempo de construcción | 9 | 8 | 8 | 7 |
| Monto del canon de arrendamiento | 4 | 5 | 10 | 2 |
| Historial de cumplimiento en proyectos similares | 10 | 9 | 5 | 8 |
| Estructura Administrativa y recursos de programa de Mantenimiento | 9 | 9 | 8 | 8 |
| **Total de puntos** | **82** | **77** | **76** | **75** |

Por entender que la sentencia del Tribunal de Apelaciones plasma de forma íntegra la evaluación de las propuestas de acuerdo a cada uno de los criterios del RFP, procedemos a citarla *in extenso*:

"1. Ubicación o localización del terreno

*Maranello* y *Bird* alegaron que se les debe asignar la mayor puntuación en este criterio porque ambos entienden

que la ubicación de sus terrenos es superior a la ubicación que propuso *STZ*.

Por un lado, *Maranello* señaló que el nuevo centro judicial no debe construirse en el casco urbano de Aibonito, sino que debe ubicarse en un sitio céntrico y accesible a los otros cinco municipios que componen la Región Judicial de Aibonito. Es por ello que *Maranello* propuso un terreno localizado al oeste del casco urbano del mencionado municipio.

Por otro lado, *Bird* alegó que la ubicación del terreno propuesto por *STZ* aumentaría el problema del tráfico en el casco urbano de Aibonito. Según sus argumentos, *STZ* no sometió un estudio de tráfico relacionado con el impacto y los problemas de tránsito que pudiera ocasionar la ubicación del nuevo Centro Judicial en el casco urbano de Aibonito. Señaló, además, que el proyecto de *STZ* no contaba con el endoso del alcalde de Aibonito.

El expediente refleja que los argumentos de *Maranello* y *Bird* fueron evaluados en los dos informes que emitió el Comité Evaluador en reconsideración y en el informe final de la Oficina de Asuntos Legales. De igual forma, el Informe de Evaluación Técnica y los tres informes en reconsideración revelan que la ubicación del terreno de *Maranello* recibió una de las puntuaciones más bajas por su ubicación. Como cuestión de hecho, *Noravi* recibió 1 punto, seguido por *Maranello*, quien recibió 2 puntos.[5]

---

[5] Apéndice de *O.A.T.*, Informe de Evaluación Técnica, pág. 374.

En los tres informes en reconsideración se detallaron las razones por las cuales el terreno de *Maranello* recibió una de las puntuaciones más bajas. Primero, la localización de su terreno fue la más lejana al casco urbano de Aibonito, en comparación con las otras propuestas.[6] Segundo, el terreno se ubica en la carretera núm. PR-162, que según las determinaciones del Comité Evaluador, es una carretera sumamente estrecha. Tercero, el terreno está fuera del área zonificada de Aibonito, lo que requeriría presentar una consulta de ubicación para aprobar la construcción del proyecto. Cuarto, en los alrededores del terreno de *Maranello* no existen instalaciones de apoyo a los usuarios del tribunal, tales como bancos o establecimientos de comidas.[7] El Comité Evaluador concluyó que, aun cuando el nuevo Centro Judicial de Aibonito incluyera espacios tales como, cafeterías, espacios de estacionamiento y gimnasios, ello no significaba que el proyecto se ubicara en un espacio aislado y desconectado del resto del vecindario.[8]

El expediente refleja que el terreno propuesto por *Maranello* tenía serias deficiencias en cuanto a su ubicación, vías de accesos y cercanía con las instalaciones comerciales. Tales deficiencias fueron

---

[6] Véase: Ilustración en el Informe de Evaluación Técnica, Apéndice de *O.A.T.*, pág. 187.
[7] Apéndice de *O.A.T.*, Informe del 20 de diciembre de 2010, págs. 600-601. *Véase,* además: Informe del 2 de agosto de 2010, págs. 476-477, 487; Informe del 12 de noviembre de 2010, págs. 514-515 y 528-530; Informe del 20 de diciembre de 2010, págs. 573-574, 567 y 599.
[8] Apéndice de *OAT*, Informe del 20 de diciembre, pág. 599.

plasmadas detalladamente en el Informe de Evaluación Técnica y en los tres informes en reconsideración. El Comité Evaluador tomó en consideración el aspecto de que el terreno estuviera cerca de instalaciones comerciales y fue un elemento importante al evaluar este criterio. También evaluó las vías de acceso en cada uno de los terrenos propuestos. La Oficina de Asuntos Legales acogió las recomendaciones del Comité Evaluador y concluyó que "los predios que estaban cerca del centro urbano, justo a las afueras del centro del pueblo, pero fuera del área donde existe la congestión vehicular típica de dichos centros, fueron evaluados favorablemente".[9]

Un examen del expediente refleja que la ubicación de los terrenos de *Bird* y *STZ* recibieron las puntuaciones más altas. Según las conclusiones del Comité Evaluador y la Oficina de Asuntos Legales, ambos terrenos se encontraban cercanos o adyacentes al centro urbano de Aibonito, pero justo a las afueras del casco urbano. El Comité Evaluador determinó que la localización de los terrenos de *Bird* y *STZ* no debía contribuir significativamente a la congestión de tránsito, toda vez que no estaban localizados en un área donde existía este problema. Además, señaló que el terreno de *STZ* no se encontraba dentro del casco urbano de

---

[9] Apéndice de *OAT*. pág. 600.

Aibonito, sino en la periferia, a unos 1200 metros de la plaza de recreo.[10]

A diferencia del terreno de *Maranello*, el resto de los terrenos se ubicaron en la carretera número PR-14, que es una vía principal que da acceso al municipio de Aibonito y provee un acceso adecuado al resto de los municipios colindantes.

Valga señalar que la diferencia entre las puntuaciones de *STZ* y *Bird* fue de un solo punto. El Comité Evaluador concluyó que *STZ,* quien obtuvo 9 puntos, fue quien mejor cumplió con el criterio de la ubicación. No obstante, *Bird* cuestionó esta puntuación bajo dos premisas. Primero, alegó que *STZ* no tenía el endoso del Municipio de Aibonito para la ubicación del terreno y segundo, que la ubicación de *STZ* aumentaba el problema de tráfico en el casco urbano.

Los argumentos de *Bird* fueron evaluados en los tres informes que se emitieron en reconsideración. En relación con su primer argumento, el Comité Evaluador concluyó que el endoso del Municipio de Aibonito no era un requisito para cumplir con las especificaciones preliminares del *RFP,* ni fue un aspecto que se consideró al momento de evaluar las propuestas. No empece a ello, en el informe del 20 de diciembre de 2010, la Oficina de Asuntos Legales aclaró lo siguiente:

---

[10] Apéndice de *O.A.T.,* Informe del 20 de diciembre de 2010, págs. 600-601. Véanse, además: Informe del 2 de agosto de 2010, págs. 476-477, 487; Informe del 12 de noviembre de 2010, págs. 514-515 y 528-530; Informe del 20 de diciembre de 2010, págs. 573-574, 567 y 599.

> Más adelante, como parte del proceso de planificación y diseño, la entidad de desarrollo seleccionada tendrá que obtener todos los permisos y aprobaciones necesarias para el desarrollo del proyecto, incluyendo los endosos y aprobaciones del Municipio de Aibonito que sean requeridas por ley o reglamentos. Por otro lado, de la información sometida en cada una de las propuestas que forman parte del expediente administrativo, no surge oposición, de parte del Municipio de Aibonito, a alguna de las propuestas recibidas.[11]

Tampoco el *RFP* requería que los proponentes realizaran un estudio de los problemas de tráfico que pudieran ocasionar la ubicación de sus terrenos. Por lo tanto, aun cuando *STZ* no sometiera un estudio de tráfico o el endoso del Municipio de Aibonito, el Comité Evaluador concluyó que estos documentos no eran necesarios al momento de evaluar su propuesta y designar el orden de preferencia. De hecho, el Comité Evaluador concluyó que la ubicación del terreno propuesto por *STZ* no debía tener un impacto significativo en el tráfico.

Ahora bien, *Bird* señala que su propuesta fue la única que contó con una consulta de ubicación debidamente aprobada por la Junta de Planificación. Ante ello, alega que la *O.A.T.* debió seleccionarlo como el licitador agraciado. Sostiene que la construcción de la nueva sede judicial no sería viable sin la consulta de ubicación y el endoso del Municipio de Aibonito. Para sustentar sus argumentos citó, como ejemplo, el caso de *STZ Development, Corp. v. Junta de Planificación*, KLRA200900021 del 12 de

---

[11] Apéndice de *O.A.T.,* págs. 577-580.

mayo de 2009.[12] En este caso, la Junta de Planificación denegó la consulta de ubicación presentada por *STZ* para la construcción del nuevo Centro Judicial de Caguas, y su dictamen fue confirmado por el Tribunal de Apelaciones. A base de este ejemplo, *Bird* señala que la propuesta de *STZ* para el Centro Judicial de Aibonito, no contó con una consulta de ubicación aprobada. Sostiene que la omisión de *STZ* contraviene los mejores intereses de la *O.A.T.* y la celeridad de los procesos, si se toma en consideración las pasadas experiencias con este licitador. Los planteamientos de *Bird* no son correctos.

Contrario a los argumentos de *Bird,* lejos de favorecer a *STZ,* en pasadas ocasiones la *O.A.T.* ha seguido el proceso de negociación según el orden de preferencia designado por el incumplimiento del licitador agraciado. Por ejemplo, en el caso del Centro Judicial de Caguas, la Junta de Planificación no aprobó la consulta de ubicación presentada por *STZ.* Ante ello, la *O.A.T.* continuó el proceso de negociación con el segundo proponente designado en el orden de preferencia (*Ramhill Developers, Inc*.). De esta forma, la *O.A.T.* continuó el proceso de negociación con el segundo proponente en la lista de preferencia.

Valga señalar que los recursos de *mandamus* presentados por *STZ,* los cuales se relacionaron con diversos trámites administrativos que se suscitaron luego de la sentencia

---

[12] Este caso fue resuelto por el panel de jueces integrado por el Hon. González Vargas (juez ponente), Hon. Soler Aquino y la Hon. Carlos Cabrera.

del 2009 en el caso del Centro Judicial de Caguas, fueron denegados por el Tribunal de Apelaciones. *Véase,* por ejemplo: *STZ Development Corp. v. Junta de Planificación,* KLRX201100015 del 13 de mayo 2011, relacionado con la consulta de ubicación de *Ramhill Developers.*[13] Véase, además, *STZ Development Corp. v. Municipio Autónomo de Caguas,* KLRX201000058 del 14 de octubre de 2010, relacionado con el Plan de Área del Municipio de Caguas para la construcción del nuevo Centro Judicial de Caguas.[14] Lo anterior denota que en las pasadas negociaciones de proyectos similares al Centro Judicial de Aibonito, la *O.A.T.* no ha brindado un trato preferencial a *STZ,* sino por el contrario, le ha exigido cumplir con los requisitos de la negociación. Los casos citados evidencian que *STZ* ha tenido que cumplir con todos los requisitos establecidos para viabilizar el contrato con la *O.A.T.,* pues de lo contrario, el proceso de negociación continuará con el próximo licitador en el orden de preferencia.

En el caso ante nuestra consideración, el *RFP* del proyecto de Aibonito no requería que los proponentes sometieran una consulta de ubicación durante el proceso preliminar de la evaluación de las propuestas. Tampoco la *O.A.T.* estaba obligada a exigir una consulta de ubicación aprobada, como requisito previo para evaluar las propuestas. Se trata de una etapa preliminar donde se

---

[13] Panel integrado por los jueces Rivera Román (juez ponente), Fraticelli Torres, Hernández Sánchez y Ramos Torres.
[14] Panel integrado por los jueces González Vargas (juez ponente), Soler Aquino y Carlos Cabrera.

evalúan las propuestas para luego designar el orden de preferencia. La aprobación de la consulta de ubicación es un trámite que se inicia luego de que se notifique el orden de preferencia para la negociación de la nueva sede judicial de Aibonito.

Las determinaciones de la *O.A.T.* al evaluar y asignar las puntuaciones por la ubicación de los terrenos son razonables y están avaladas por los documentos que obran en el expediente administrativo. Por lo tanto, el análisis que el Comité Evaluador utilizó, en el ejercicio de su *expertise*, para evaluar la ubicación de los terrenos, no debe ser sustituido por el nuestro. Procede confirmar las puntuaciones que se asignaron en el criterio de ubicación.

2. Amplitud del terreno

   a. *Cabida adicional para ampliación futura del edificio.*

En el *RFP* se especificó que "el terreno de las nuevas instalaciones del Centro Judicial debe contar con cavidad [sic] adicional para ampliación futura".[15] Conforme los argumentos de *Maranello* y *Bird,* la propuesta de *STZ* no incluyó un espacio que permitiera ampliaciones futuras. *Maranello* específicamente señala que esta omisión es insubsanable, por lo que la *O.A.T.* tenía que descalificar a los licitadores que no cumplieron con tal requisito, incluyendo a *STZ.*

---

[15] Apéndice de *O.A.T.*, pág. 6.

Por otro lado, tanto *Bird* como *Maranello* señalan que el terreno de *STZ* tiene una cabida menor y alegan que la *O.A.T.* actuó arbitrariamente al otorgarle 8 puntos. *Bird* propuso un terreno de 8 cuerdas y obtuvo una puntuación de 10 puntos. Sin embargo, alega que se concedieron 8 puntos a *STZ* por un terreno de solo 4 cuerdas. Ante ello, sostiene que la *O.A.T.* actuó arbitrariamente al asignar las puntuaciones por la amplitud del terreno.

En su alegato en oposición, la *O.A.T.* argumentó que la amplitud del terreno fue un criterio importante, pero no fue un requisito determinante al momento de evaluar las propuestas. Según sus planteamientos, los participantes que ofrecieron los terrenos de mayor cabida o tamaño recibieron puntuaciones más altas. No obstante, el terreno de *STZ* de 4.01 cuerdas, obtuvo una puntuación similar a los terrenos de mayor cabida por las siguientes razones: (1) algunas de las propuestas de mayor cabida tenían una topografía que no permitía usar parte del terreno, y (2) el terreno de *STZ* podía utilizarse en su totalidad.

El expediente refleja que los terrenos de mayor dimensión obtuvieron puntuaciones más altas en este criterio. Por ejemplo, *Bird,* con su terreno de 18.6544 cuerdas obtuvo 10 puntos. *Roig*, por su terreno de 8.354 cuerdas obtuvo 9 puntos. *Maranello* propuso un terreno de 9.04, más 5.27 cuerdas de expansión futura, por lo que obtuvo 10. *STZ,* con un terreno de 4.01 cuerdas, obtuvo 8

puntos.[16] Lo anterior denota que las puntuaciones corresponden al tamaño mayor de los terrenos y a la cabida real que podía utilizarse para la construcción del proyecto.

Ahora bien, *Bird* argumentó que la propuesta de *STZ* carece de especificidad, toda vez que solo ofreció un piso adicional en el edificio, de ser necesario. Sin embargo, *STZ* no detalló las escaleras ni los elevadores que se utilizarían.

Los argumentos de *Bird* fueron atendidos en los tres informes en reconsideración. El Comité Evaluador concluyó que la propuesta de *STZ* permitía construir un piso adicional en los edificios.[17] Aparte de construir un piso adicional, en la propuesta de *STZ* aparecían varias áreas sin construcción, que también podían utilizarse para una ampliación futura del edificio. En el diseño se propuso la construcción de 3 edificios (administración, salas y otros espacios de estacionamiento) los cuales estarán interconectados mediante una construcción eficiente.[18] El Comité Evaluador, además, concluyó que el hecho de que no se proveyeran detalles sobre las especificaciones de las escaleras o elevadores, no impedía que se evaluara la propuesta de *STZ* en esta etapa de los procedimientos, porque la información requerida era preliminar. En fin, la dimensión del área o amplitud del terreno propuesta por

---

[16] Apéndice de *O.A.T.*, págs. 238, 276, 317.
[17] Apéndice de *O.A.T.*, Informe de 2 de agosto de 2010, págs. 477-478.
[18] Apéndice de *O.A.T.*, Informe del 12 de noviembre de 2010, págs. 515-516, 531.

*STZ* cumple con el criterio. Sin embargo, la mayor extensión del terreno de los otros proponentes les significó una mejor puntuación en ese criterio que la recibida por *STZ*. Dicho de otra forma, la propuesta de *STZ* cumple con lo requerido, pero lo ofrecido por *Bird* es superior. En el supuesto de que se le redujera un punto a *STZ* en el criterio de la amplitud del terreno, ello no afecta el resultado final en el orden de preferencia.

Analizado lo anterior, concluimos que la escala valorativa y los aspectos que tomó en consideración la *O.A.T.* para examinar la amplitud de los terrenos fueron razonables y sus determinaciones están sostenidas por la evidencia sustancial que obra en el expediente.

3. Calidad y funcionalidad del diseño y construcción

   *a. Uso hormigón postensado*

En el *RFP* se especificó que la construcción de las facilidades sería en hormigón armado u hormigón armado en acero. Las propuestas debían incluir lo siguiente:

4. Cimientos y estructuras

> Deben ser en hormigón armado u hormigón armado y acero. El proponente establecerá las razones para la utilización de un sistema estructural u otros. Las naves estructurales no deben ser menos de 30' x 30' y se requerirá un sistema modular repetitivo dentro de las áreas principales. El proponente será responsable de que la estructura cumpla con los requisitos de los códigos y reglamentaciones aplicables con relación a resistencia, seguridad e integridad estructural y se debe garantizar un diseño de vida útil de nos menos de cincuenta (50) años. [19]

---

[19] Apéndice de *O.A.T.,* pág. 42.

*Maranello* adujo que *STZ* incluyó hormigón postensado en el diseño de la estructura del edificio de estacionamientos, por lo que incumplió con las especificaciones del *RFP.*

La *O.A.T.*, por su parte, adujo que en esta etapa de los procedimientos, se permitía una desviación de las especificaciones del *RFP* si se explicaba detalladamente en la propuesta. Sobre este particular, la instrucción núm. 1 del *RFP* indicó lo siguiente:

1. Preparación de Propuesta

   a. Los proponentes someterán toda la información requerida en las instrucciones, especificaciones y criterios establecidos en la Solicitud de Propuesta (RFP). Deben someter toda la información que se solicite y consideren necesaria, incluyendo planos, especificaciones y fotografías o recortes de catálogos, equipos, materiales y métodos de construcción. <u>Cualquier desviación de los requisitos establecidos tiene que ser explicada claramente por el proponente o desarrollador.</u>

   ……..

   e. Cualquier propuesta condicionada o con limitaciones podría ser descalificada. <u>Cualquier limitación o condición deberá ser aclarada en detalle.</u>

(Citas omitidas y énfasis suplido.)[20]

La *O.A.T.* señala que ninguna de las propuestas cumplió con todos los requisitos y especificaciones establecidas en el *RFP.*[21] Sostiene, además, que en la etapa preliminar en la que se encuentra la evaluación de las propuestas se podía incluso considerar que se construyera el edificio de

---

[20] Apéndice de *O.A.T.*, pág. 13.
[21] Apéndice de *O.A.T.,* Informe de Evaluación Técnica, pág. 188.

estacionamiento en hormigón postensado, si se proveen las razones válidas para la desviación. Señala que el ingeniero estructural de *STZ* recomendó el hormigón postensado, ya que entendía que era el material más conveniente para la eliminación de grietas en las losas, menos peralto entre los pisos, mayor rapidez en la construcción del edificio y menos deflexión y vibración en la estructura.

No empece a lo anterior, la *O.A.T.* entiende que *STZ* cumplió con las especificaciones del *RFP,* ya que en su propuesta incluyó la alternativa de construir el edificio del estacionamiento en acero y hormigón, al mismo precio que la oferta de hormigón postensado. Ahora bien, señaló que el detalle de la alternativa en acero y hormigón no se incluyó en la propuesta de *STZ* debido a la limitación en la cantidad de las páginas que se permitieron someter (el *RFP* estableció hasta un máximo de 20 páginas).[22]

No vemos fundamento para variar las puntuaciones que se asignaron en este criterio. *STZ* explicó las razones para la desviación de las especificaciones del *RFP*, las cuales fueron válidamente aceptadas por el Comité Evaluador.[23] Además, *STZ* proveyó una alternativa de construcción en acero y hormigón por el mismo precio que el material de hormigón postensado, lo que fue suficiente para cumplir

---

[22] Apéndice de *O.A.T.*, pág. 19.
[23] Véanse: Apéndice de *O.A.T.*, Informe del 2 de agosto de 2010, pág. 489; Informe del 12 de noviembre de 2010, págs. 532-533; Informe del 20 de diciembre de 2010, págs. 575, 605.

con las especificaciones del *RFP* en esta etapa de los procedimientos.[24] El error no se cometió.

### b. *Naves estructurales*

Según las especificaciones técnicas del *RFP,* las naves estructurales no debían ser menos de 30 x 30 pies. *Bird* y *Maranello* argumentaron que *STZ* incumplió con las dimensiones requeridas para las naves estructurales del edificio.

*Bird* alegó que *STZ* solamente cumplió con la nave estructural destinada para el área de la administración, pero incumplió con las dimensiones del resto de las naves estructurales. Según sus argumentos, *Roig* tampoco cumplió con este criterio, ya que propuso naves estructurales de 18 x 30 pies y 25 x 25 pies.

Por otro lado, *Maranello* sostuvo que el propio consultor externo de la *O.A.T.* indicó en el Informe de Evaluación Técnica, que *STZ* no cumplió con las medidas para las naves estructurales.

La *O.A.T.,* por su parte, sostiene que *STZ* proveyó una explicación detallada para la desviación de las dimensiones, que fueron aceptadas conforme a la instrucción núm. 1 del *RFP. STZ* propuso una nave estructural de 30 x 30 pies, y un edificio de salas de 24 x 36 pies. El Comité Evaluador determinó que *STZ* cumplió

---

[24] Apéndice de *O.A.T.*, Informe del 2 de agosto de 2010, pág. 489. Tales determinaciones se reiteraron en el Informe del 12 de noviembre de 2010, págs. 519, 527 y 532-533, así como en el Informe de la Oficina de Asuntos Legales del 20 de diciembre de 2010, págs. 585, 605.

con las medidas requeridas en el *RFP* y expresó lo
siguiente:

> En la propuesta de STZ aparecen varias áreas sin
> construcción que pudieran utilizarse para
> ampliación futura, aparte de construir un piso
> adicional a los edificios. El diseño propone tres
> edificios: administración, salas y otros espacios
> y estacionamiento. El edificio de administración
> tiene naves de 30 x 30 pies. El edificio de salas
> y otros espacios relacionados tiene espacialmente
> variables entre 12 x 36 pies, modulados para un
> diseño eficiente, particularmente de las salas.
> El edificio de estacionamiento tiene
> espaciamientos de 21, 26 y 59 pies, adecuados
> para el uso propuesto.[25]

Los argumentos de *Maranello* y *Bird* fueron correctamente
evaluados y adjudicados por la *O.A.T.* La variación en la
propuesta de *STZ* fue explicada y evaluada por el Comité
Evaluador. No existe razón para variar la puntuación que
obtuvo *STZ* en este criterio.

a. *Certificación del edificio como Green Building*

Antes de entrar a discutir el error señalado por
*Maranello*, es importante que aclaremos los formularios que
se utilizaron para evaluar el cumplimiento con este
criterio.

Conforme a los argumentos de la *O.A.T.,* los proponentes
realizaron una autoevaluación sobre las características
"pro ambientales" de sus respectivos edificios y la
incluyeron en sus propuestas. Los proponentes utilizaron
dos formularios estandarizados. En el apéndice del *RFP* se

---

[25] Informe del 2 de agosto de 2010, Apéndice de *O.A.T.*, pág. 477.
Véase, además: Apéndice de *O.A.T.*, Informe 2 de agosto de 2010, págs.
477 y 489; Informe 12 de noviembre de 2010, págs. 517 y 532-535;
Informe del 20 de diciembre de 2010, págs. 575-605.

incluyó el formulario 2.1, pero algunos proponentes sometieron la autoevaluación utilizando el formulario 3.0. El Comité Evaluador evaluó el cumplimiento de *Green Building* y tomó en consideración ambos formularios.

En el recurso de revisión, *Maranello* cuestionó la puntuación que obtuvo en el criterio de *Green Building* mediante una comparación con la puntuación que obtuvo *Roig* en este mismo renglón. *Maranello* alega que, conforme al formulario 3.0, su diseño obtuvo 53 puntos, por lo que fue clasificado en la categoría plata. En cambio, *Roig* utilizó el formulario 2.1 y fue clasificado en la categoría oro, a pesar de que obtendría una puntuación similar a la que *Maranello* obtuvo bajo el formulario 3.0. Ante ello, alega que si la propuesta de *Roig* hubiera sido evaluada bajo el formulario 3.0, *Roig* hubiese obtenido su misma puntuación, es decir, ambas propuestas se colocarían en la categoría plata. En virtud de lo anterior, *Maranello* argumenta que la *O.A.T.* erró al asignarle 8 puntos a *Roig,* como resultado de la reconsideración, mientras que su puntuación solo aumentó a 7 puntos.

Según los argumentos de la *O.A.T.*, durante el proceso de evaluación existieron discrepancias en los sistemas de puntos que se incluyeron en los dos formularios para las categorías de *certified silver, gold y platinum.* Ante tales discrepancias, el Comité evaluó el cumplimiento con el criterio de *Green Building*, comparándolo con "la categoría de certificación que, según la información y

[los] documentos que sometieron cada uno de los proponentes, obtendrían sus respectivos diseños. Esto independientemente de la cantidad de puntos que reclaman obtener."[26]

De la solicitud de reconsideración de *Maranello* surge que, en aquella ocasión, este licitador cuestionó su puntuación comparándola con la calificación que obtuvo *Bird* en la clasificación plata.[27] Nada argumentó *Maranello* en cuanto a la puntuación que obtuvo *Roig.*

Inicialmente, el Comité Evaluador evaluó los argumentos de *Maranello* en los informes del 2 de agosto y 12 de noviembre de 2010, y mantuvo los 6 puntos que se le asignó en este criterio.[28] Ahora bien, la puntuación de *Maranello* se corrigió en el informe del 20 de diciembre de 2010, para ajustarla a las puntuaciones que obtuvieron los demás proponentes en la categoría plata. En este informe, la Oficina de Asuntos Legales recomendó lo siguiente:

> (11) Certificación del edificio como uno "Green Building"
>
> Luego de evaluar la información suministrada y siendo consistente con el análisis que llevo a cabo el Comité en la evaluación del cumplimiento con este criterio se recomienda ajustar la puntuación obtenida por Maranello y aumentarla de 6 a 7 puntos, la cual fue la puntuación que recibieron las demás propuestas que indicaron lograr una certificación ("silver"). De igual

---

[26] Véase: Informe de 20 de diciembre de 2010, Apéndice de *O.A.T.*, págs. 585-586.

[27] Apéndice de *O.A.T.*, pág. 396; Informe del 20 de diciembre de 2010, pág. 575.

[28] Apéndice de *O.A.T.*, Informe 2 de agosto de 2010, págs. 480, 489; Informe de 12 de noviembre, págs. 519, 532. También se mantuvo la puntuación de *Roig.* Id. pág. 525. No obstante, su puntuación cambió en el informe del 20 de diciembre de 2010.

forma, y por los mismos fundamentos, se recomienda ajustar la puntuación otorgada en este criterio a Desarrollos Roig de 6 a 8 puntos, la cual fue la puntuación obtenida por la otra propuesta que indicó cumplimiento para lograr una certificación oro ("gold").[29]

De lo anterior surge que la puntuación inicial que obtuvo *Maranello* se corrigió en reconsideración. No empece a ello, *Maranello* reclama un nuevo reajuste en su puntuación, esta vez, comparándola con la puntuación que obtendría *Roig* si se utiliza el formulario 3.0. No podemos avalar tales argumentos.

*Maranello* no nos coloca en posición de evaluar sus planteamientos. En primer lugar, no especificó cuál fue el cálculo y los criterios que tomó en consideración para sostener que la puntuación de su diseño era la misma que obtuvo *Roig* en el formulario 3.0. Tampoco hace referencia, ni discute cuáles fueron las discrepancias entre ambos formularios. Más aun, los cuestionamientos que realiza *Maranello* sobre la puntuación y clasificación que obtuvo *Roig* en la certificación de *Green Building*, se presentan por primera vez en el recurso de revisión. No podemos cambiar la puntuación que le asignó el Comité Evaluador a base de meras alegaciones. Le corresponde al que impugna una decisión administrativa ponernos en condiciones para evaluar sus planteamientos. El error no se cometió.

5. <u>Calidad y funcionamiento del estacionamiento,</u>

*Bird* impugnó la puntuación que obtuvo *STZ* en este criterio, bajo los siguientes fundamentos: (1) la cantidad

---

[29] Apéndice de *O.A.T.*, Informe de 20 de diciembre de 2010, pág. 604.

de los estacionamientos solicitados en el *RFP* fue ilegal, si se toma en consideración la cantidad de espacios que requiere el Reglamento Núm. 4 de la Junta de Planificación, según la cabida del edificio;[30] (2) *STZ* propuso 548 espacios de estacionamientos, lo que constituye 92 estacionamientos menos al número requerido por la Junta de Planificación; (3) la *O.A.T.* erró al no tomar en consideración que la cantidad de espacios de estacionamientos tiene que cumplir con la reglamentación vigente; (4) el cálculo de arrendamiento propuesto por *STZ* fue incorrecto.

*Maranello*, por su parte, reiteró que la propuesta de construcción del edificio de estacionamiento de *STZ* fue en hormigón postensado, lo cual incumplió con las especificaciones establecidas en el *RFP*.[31]

Al evaluar este criterio, el Comité Evaluador asignó 10 puntos a *Bird* y a *STZ,* mientras que *Maranello* obtuvo 9 puntos. *Roig*, por su parte, obtuvo 7 puntos. En el informe del 20 de diciembre de 2010 (donde se resumieron las recomendaciones del Comité Evaluador sobre este asunto) la Oficina de Asuntos Legales indicó lo siguiente:

> Como ya se ha discutido anteriormente, el documento de RFP indica que se requieren 242 estacionamientos para empleados y jurados y 240 para visitantes. La propuesta de STZ incluyó 260 espacios para empleados y 243 para visitantes, por lo que cumplió con lo requerido. Si en [el] proceso de permisos, alguna agencia requiere

---

[30] Apéndice del recurso de *Bird*, págs. 112, 119-120.
[31] Sobre este señalamiento de error, véase lo discutido en el criterio de calidad y funcionalidad del diseño y construcción, Parte III (A)(3) de esta sentencia.

espacios de estacionamientos adicionales, esto sería un cambio en el diseño que el proponente seleccionado deberá cumplir como parte del proceso de desarrollo del proyecto.

Como ya se ha señalado, el Comité entiende que la opinión sobre el número de espacios de estacionamientos que requería el proyecto del proponente seleccionado, según la reglamentación vigente es incorrecta ya que toma en consideración el número de pies cuadrados total y no los pies cuadrados netos. No obstante, los requisitos de cantidad de espacios de estacionamientos que tenga que cumplir el proyecto seleccionado durante el proceso de diseño y permisos no fue parte de la evaluación del cumplimiento de este criterio. En este criterio tanto, STZ como Bird Interplan obtuvieron la máxima puntuación de 10 puntos.[32]

El razonamiento del Comité Evaluador se fundamentó en la premisa de que en la etapa inicial del proceso de evaluación de las propuestas para designar el orden de preferencia, no se evaluó si la cantidad de espacios de los estacionamientos propuestos cumplía o no con la reglamentación vigente. Ello, toda vez que la evaluación de este aspecto se dejaría para una etapa posterior. Además, concluyó que los argumentos de *Bird* en torno a la cantidad de los estacionamientos requeridos por el reglamento es incorrecta, toda vez que se fundamentó en una premisa equivocada, a saber, calculó el número total de pies cuadrados y no contempló los pies cuadrados netos. Por tales razones, el Comité Evaluador descartó los argumentos de que el número de los estacionamientos requeridos, violó el Reglamento de la Junta de Planificación.

---

[32] Apéndice de *O.A.T.*, Informe del 20 de diciembre de 2010, pág. 587.

No hemos encontrado arbitrariedad en las conclusiones del Comité Evaluador. La etapa preliminar en la que se encuentra el proyecto no requiere que se evaluara si el número de estacionamientos cumple o no con las requisitos reglamentarios de la Junta de Planificación. Precisamente, el proceso de la subasta informal y el mecanismo del *RFP* permiten que las partes entren posteriormente, en un proceso de negociación donde se pueda aclarar las especificaciones del proyecto y se atienda el cumplimiento de los requisitos reglamentarios inherentes a la práctica de la construcción y la ingeniería. El error no se cometió.

Aclarado lo anterior, examinemos los criterios que el Comité Evaluador consideró para evaluar la calidad y el funcionamiento de los espacios de estacionamientos que propusieron los proponentes.

El expediente refleja que algunos proponentes sometieron estacionamientos en superficie o terreros, mientras que otros propusieron edificios de estacionamientos cerrados o parcialmente techados. El Comité Evaluador no favoreció necesariamente el estacionamiento *multipisos* sobre el estacionamiento terrero, pues ambos modelos tienen sus ventajas y desventajas y eso se reflejó al comparar las propuestas y puntuaciones otorgadas. El Comité Evaluador evaluó las ventajas y desventajas de cada uno de los diseños

propuestos y asignó la puntuación correspondiente.[33] El criterio de la calidad y funcionalidad de los estacionamientos se evaluó conforme a la información que proveyó cada uno de los proponentes.

En relación con la propuesta de *Maranello*, el Comité Evaluador le asignó 9 puntos. *Maranello* propuso un estacionamiento terrero con capacidad para 528 vehículos, 242 empleados y jurados, 240 para visitantes, 16 estacionamientos para jueces y 30 estacionamientos para autos oficiales.[34] Además, propuso un estacionamiento parcialmente techado y cerrado para 16 jueces. No obstante, el Comité Evaluador concluyó que en los planos de la propuesta, *Maranello* mostró una distribución distinta. Esta conclusión no fue rebatida por *Maranello* en su recurso de revisión.

*STZ*, por su parte, propuso un edificio techado con 243 estacionamientos para empleados, 260 para visitantes, 15 estacionamientos para los jueces y 42 estacionamientos para vehículos oficiales, para un total de 560 estacionamientos.[35] El Comité Evaluador le asignó 10 puntos.

*Bird,* en cambio, propuso 789 espacios de estacionamientos, incluyendo 383 para empleados, 303 para visitantes, 38 para impedidos, 15 espacios para jueces, 45

---

[33] Apéndice de *O.A.T.,* Informe 2 de agosto de 2010, pág. 481; Informe de 12 de noviembre de 2010, págs. 520, 533; Informe del 20 de diciembre de 2010, pág. 605.
[34] Apéndice de *O.A.T.,* Informe de Evaluación Técnico, págs. 325-326.
[35] Apéndice de *O.A.T.,* Informe de Evaluación Técnica, págs. 365-366.

para vehículos oficiales.[36] El estacionamiento de jueces sería en el sótano y en un espacio techado y cerrado. El estacionamiento para vehículos oficiales sería en un espacio abierto, lo que incumplió con las especificaciones del *RFP,* que requería que estuviera en un área cerrada.[37] El Comité Evaluador también le asignó 10 puntos.

Un examen del expediente y los informes de la *O.A.T.* demuestran que las puntuaciones que se asignaron en este criterio no fueron arbitrarias ni irrazonables. En ausencia de una clara justificación, no sustituiremos el *expertise* del Comité Evaluador al evaluar este criterio.

6. Historial de cumplimiento en el desarrollo de otros proyectos similares al propuesto.

En relación con este criterio, *Maranello* argumentó que la *O.A.T.* no tomó en consideración el historial de cumplimiento de los proponentes, sino su experiencia. Señaló que la experiencia no fue un criterio que se incluyó en el *RFP.* Ante ello, alegó que no se podía evaluar el historial de cumplimiento a base de la experiencia. En la alternativa, *Maranello* adujo que si el criterio hubiera sido la experiencia, su equipo de trabajo tenía suficiente experiencia en la construcción del Centro Judicial de Carolina, por lo que su puntuación debía ser aún mayor.

Contrario a los argumentos de *Maranello*, el expediente refleja que el aspecto de la experiencia fue un elemento

---

[36] Apéndice de *O.A.T.*, Informe de Evaluación Técnica, págs. 252-253.
[37] Apéndice de *O.A.T.*, Informe de Evaluación Técnica, pág. 242.

presente desde el extrínseco al momento de evaluar el criterio del historial de cumplimiento. Para evaluar este historial, necesariamente se tuvo que hacer un análisis sobre la experiencia de los proponentes en el diseño, la construcción, el financiamiento y el arrendamiento de proyectos similares al Centro Judicial de Aibonito. Ambos aspectos no son excluyentes. Por lo tanto, no podemos avalar los planteamientos de *Maranello* al señalar que el aspecto de la experiencia fue un criterio que no se incluyó en el *RFP.*

El Comité Evaluador, al evaluar el criterio del historial de cumplimiento, no solo tomó en consideración la construcción previa de un proyecto similar al del Centro Judicial de Aibonito, sino que evaluó aquellos proyectos que incluyeron el diseño, construcción, financiamiento y arrendamiento de un edifico público. Si el proyecto similar fue desarrollado para la *O.A.T.*, se le asignaba una puntuación mayor al proponente. Así lo refleja el informe del 12 de noviembre de 2010, donde el Comité Evaluador aclaró los criterios que se tomaron en consideración para evaluar el historial de cumplimiento en proyectos similares. Al respecto, se indicó lo siguiente:

> Para evaluar el historial de cumplimiento del desarrollador con … otros proyectos similares realizados, el Comité analizó, conforme a la información suministrada en cada una de las propuestas sometidas, la experiencia de cada equipo participante en cada componente y etapa del desarrollo de un proyecto: desarrollador, diseñador, contratista o constructor y administrador y operador. Además [s]e evaluó la experiencia especifica en proyectos de naturaleza

pública-privada, particularmente en la modalidad de proyectos de instalaciones públicas y de ser aplicable, e[x]periencia previa con el desarrollo de instalaciones para el Tribunal General de Justicia. Utilizando estos elementos, el Comité entonces evaluó de forma comparativa las propuestas y ello se refleja en la puntuación otorgada a cada una de ellas.[38]

Surge de los tres informes en reconsideración que la *O.A.T.* evaluó los argumentos de *Maranello*. A pesar que *Maranello* mencionó varios proyectos de desarrollo residenciales en Puerto Rico y en Estados Unidos, no proveyó los detalles de cada proyecto. El Comité Evaluador concluyó que *Maranello* no sometió un proyecto que evidenciara su experiencia en el desarrollo, construcción y el arrendamiento con opción a compra de un edificio similar al Centro Judicial de Aibonito. De hecho, cuando se evaluó los argumentos de *Maranello* en el informe del 20 de diciembre de 2010, la Oficina de Asuntos Legales señaló lo siguiente sobre su propuesta:

Experiencia y capacidad del equipo:

El equipo de construcción tiene experiencia y recursos. No se evidenció experiencia de desarrollo de proyectos de diseño, construcción, financiamiento y operación.[39]

Por el contrario, *STZ* contaba con proyectos similares realizados para la *O.A.T.,* mientras que *Bird* sometió evidencia de un proyecto similar para la Corporación del

---

[38] Apéndice de *O.A.T.*, Informe de 12 de noviembre de 2010, pág. 534.
[39] Apéndice de *O.A.T.,* Informe de 20 de diciembre de 2010, pág. 558.

Fondo del Seguro del Estado.[40] Lo anterior evidencia que la puntuación asignada a *Maranello* está fundamentada en información sustancial que obra en el expediente administrativo, por lo que no intervendremos con la evaluación del Comité Evaluador.

Por otro lado, *Bird* cuestionó que se disminuyera la calificación que obtuvo en el criterio del historial de cumplimiento de 9 a 8 puntos, como resultado del proceso de reconsideración. Sostuvo que *Bird Construction* es socio integrante de *Bird Interplan* y que el primero fue el que construyó los centros judiciales de Humacao, San Juan y Bayamón.

Del informe del 2 de agosto de 2010 surge que el Comité Evaluador atendió los argumentos de *Bird* y concluyó que dicha entidad sometió un solo proyecto similar al Centro Judicial de Aibonito. Sobre este particular, el Comité Evaluador indicó lo siguiente:

> Se sometió un solo proyecto de diseño-construcción-financiamiento-arrendamiento, para una agencia que no es Tribunales. Se le dio la segunda evaluación más alta solamente por debajo de dos proponentes con extensa experiencia con la Administración de los Tribunales y por encima de otro licitador con experiencia.[41]

*Bird* obtuvo una calificación de 9 puntos, puesto que solamente sometió un proyecto similar al del Centro Judicial de Aibonito, que contempló el diseño,

---

[40] Apéndice de *O.A.T.*, Informe de 2 de agosto de 2010, págs. 490-491, 483; Informe de 12 de noviembre de 2010, págs. 522-523; Informe de 20 de diciembre de 2010, págs. 590, 606-607.
[41] Apéndice de *OAT*, Informe de Evaluación Técnica, pág. 367; Informe del 2 de agosto de 2010, pág. 483; Informe de 20 diciembre de 2010, pág. 590.

construcción, financiamiento y arrendamiento para una agencia que no era la Rama Judicial. Ello, contrario a los proyectos sometidos por *STZ* y *Roig,* quienes contaban con un historial de proyectos similares para la *OAT* y otras agencias públicas.[42] *Roig* fue el desarrollador del Centro Judicial de Humacao, mientras que *STZ* contaba con varios proyectos similares realizados para la OAT y para otras agencias gubernamentales.[43] El historial de *Roig* y *STZ* en proyectos similares para la *O.A.T.* no fue rebatido por *Bird* en su recurso de revisión.

Cabe destacar que en el informe del 20 de diciembre de 2010, la Oficina de Asuntos Legales le restó un punto a la calificación inicial de *Bird,* porque el proyecto que sometió fue desarrollado para otra agencia distinta a la *O.A.T.* El informe refleja lo siguiente:

> Como parte de esta revisión del proceso de evaluación de propuestas se recomienda un ajuste en la puntuación originalmente otorgada a Desarrollos Roig en este criterio de experiencia en proyectos similares. De conformidad al análisis que llevo a cabo el Comité, los proponentes con experiencia en el desarrollo de proyectos…, diseño, construcción, financiamiento y operación de instalaciones públicas obtuvieron la mayor puntuación. Si los proyectos eran específicamente para la OAT la puntuación era todavía mayor. En consideración a estos criterios se recomienda entonces otorgarle dos puntos adicionales a la propuesta de Desarrollos Roig y aumentar sus puntos de 7 a 9 puntos, ya que Desarrollos Roig presentó su experiencia como desarrollador de una instalación para la OAT, el Centro Judicial de Humacao. Noravi y STZ, los

---

[42] Para una discusión detallada de la evaluación de las propuestas de *Bird, Roig, Maranello* y *STZ*, véase: Apéndice de *OAT,* Informe de Evaluación Técnica, págs. 253, 294, 329 y 367. Véase, además: Informe del 20 de diciembre de 2010, págs. 547, 549, 552, 556, 558, 560, 562.
[43] Informe del 20 de diciembre de 2010, págs. 554 y 562.

cuales tienen varios proyectos de desarrollo de Centros Judiciales y de otras instalaciones públicas obtuvieron 10 puntos. <u>En cuanto a Bird, que presentó un proyecto de desarrollo para otra agencia pública distinta a la OAT se recomienda entonces reducir su puntuación de 9 a 8 puntos.</u>[44]

(Énfasis suplido.)

Analizado lo anterior, concluimos que la puntuación que obtuvo *Bird* en el criterio de *Historial de cumplimiento* fue razonable. No hay indicio de arbitrariedad o abuso de discreción en las puntuaciones asignadas. El expediente administrativo refleja evidencia sustancial que apoya el análisis y las puntuaciones obtenidas, por lo que debemos dar deferencia al *expertise* que la *O.A.T.* ejerció al evaluar este criterio.

7. <u>Estructura administrativa</u>

*Maranello* cuestionó la diferencia de un punto que obtuvo su propuesta en comparación con la propuesta de *STZ*. *Maranello* obtuvo 8 puntos, mientras que *STZ* obtuvo 9 puntos. Alegó que en el Informe Técnico, el consultor externo de la *O.A.T.* reveló que la propuesta de *Maranello* fue superior a la de *STZ.* Según los argumentos de *Maranello,* su propuesta contempló los servicios de mantenimiento de una compañía que tenía más de 20 años de experiencia, un equipo de 3 técnicos de mantenimiento y un número de teléfono para reparaciones disponibles las 24 horas. No obstante, la propuesta de *STZ* solo incluyó a un

---

[44] Apéndice de *O.A.T.*, pág. 610.

supervisor y a un empleado de mantenimiento y no especificó el término para las reparaciones.

En el Informe de Evaluación Técnica no encontramos fundamento que sustente las alegaciones de *Maranello.* De hecho, en relación con la propuesta de *Maranello,* el consultor externo de la *O.A.T.,* el ingeniero Herrera, señaló que la propuesta "se ofrece mantenimiento para diversas áreas, pero no se mencionan los sistemas eléctricos y mecánicos, protección de incendios, ascensores, distribución de agua, entre otros omitidos."[45] El texto del informe no indica que la propuesta de *Maranello* sea superior a la de *STZ.*

Por otro lado, la propuesta de *STZ* contempló el mantenimiento de los equipos y sistemas instalados y la contratación de una compañía independiente para la administración y operación de la propiedad. Especificó, además, que proveería un mantenimiento a "todos los equipos Sistema A/C, Sistema Eléctrico incluyendo generadores, sistema de protección contra incendios, equipos edificios inteligente, elevadores, plomería, etc."[46] También se comprometió a gestionar todos los contratos de mantenimiento para los equipos especializados.

El Comité Evaluador, en respuesta a los planteamientos de *Maranello*, señaló que la experiencia de cada proponente fue considerada al evaluar la estructura administrativa y

---

[45] Apéndice de *O.A.T.,* Informe de Evaluación Técnica, pág. 327.
[46] Apéndice de *O.A.T.,* págs. 363, 366.

el programa de mantenimiento, particularmente, en proyectos de desarrollo de instalaciones públicas para tribunales y otras agencias. El criterio de evaluación fue similar al análisis que se utilizó en el historial de cumplimiento. Es decir, en adición a los aspectos del mantenimiento que se incluyeron en las propuestas, el Comité Evaluador consideró la experiencia de los proponentes. Concluyó que *STZ* brindaba un mantenimiento aceptable en varias facilidades de la *O.A.T.*, mientras que *Bird* brindaba un buen mantenimiento al Fondo del Seguro del Estado. Como resultado de la evaluación, se le asignó igual puntuación a *Maranello* y a *Bird*, y un punto más alto a *STZ*.[47] No encontramos arbitrariedad en la puntuación asignada. El error no se cometió.

8. <u>Omisión de información en la propuesta de *STZ* sobre aspectos técnicos del proyecto</u>

    *a. Uso de materiales de primera calidad y otras especificaciones.*

Tanto *Bird* como *Maranello* alegan que *STZ* omitió información importante sobre ciertos aspectos técnicos del proyecto. Ambos alegan que *STZ* no cumplió con las especificaciones requeridas en el *RFP*.

Específicamente, *Bird* alega que *STZ* no especificó la calidad de los materiales que utilizaría. Por su parte, *Maranello* argumenta que *STZ* no especificó los detalles del

---

[47] Apéndice de *O.A.T.*, Informe de 2 de agosto de 2010, pág. 491. Véase, además: Informe de 12 de noviembre de 2010, págs. 534-535; Informe de 20 de diciembre de 2010, pág. 607.

sistema de aire acondicionado, plomería, relación de áreas y usos, sistema mecánico, escaleras, ascensores al público, ascensores de jueces, ascensores para confinados, sistema central de incendios y en torno al sistema de supresión de incendios.[48] Sostiene, además, que tales deficiencias fueron señaladas en el Informe de Evaluación Técnica.

En relación con los planteamientos de *Bird* y *Maranello,* el Comité Evaluador concluyó que el *RFP* no requería que se incluyeran todos los detalles y especificaciones del proyecto en las propuestas. Tampoco se requirió a ninguno de los proponentes que detallara todos y cada uno de los materiales que utilizaría, ya que la información que se sometió en todas las propuestas fue preliminar. Las otras propuestas tampoco incluyeron los detalles de los materiales propuestos.

La Oficina de Asuntos Legales reiteró las conclusiones del Comité Evaluador en el informe del 20 de diciembre de 2010. Allí se especificó que los proponentes incluyeron la información general sobre el uso de materiales de primera calidad en la etapa conceptual y esquemática del desarrollo del proyecto. Por ejemplo, la propuesta de *STZ* incluyó un listado de "todas las terminaciones y materiales, tanto exteriores como interiores que se proponen en [el] diseño del centro judicial."[49]

---

[48] Apéndice de *O.A.T.*, Informe de Evaluación Técnica, pág. 357.
[49] Apéndice de *O.A.T.,* Informe del 20 de diciembre de 2010, págs. 604-605.

El Comité Evaluador concluyó que ninguna de las propuestas cumplió totalmente con los requisitos del *RFP.* Varias de las propuestas, incluyendo la de *STZ*, omitieron alguna información técnica.[50] No obstante, el Comité Evaluador determinó que la información que sometieron los licitadores fue suficiente para evaluar sus propuestas y designar el orden de preferencia. Ello, toda vez que la omisión de cierta información técnica o algún documento específico del proyecto, sería considerado en la etapa de revisión del diseño final de la propuesta seleccionada. Concluyó el Comité Evaluador que los documentos y los planos que se sometieron junto con las propuestas fueron preliminares y esquemáticos, por lo que no se tenía que proveer todos los detalles del proyecto en esta etapa. Los detalles de las especificaciones se someterían posteriormente durante el proceso, en la etapa de diseño.[51]

Los argumentos de *Maranello* fueron atendidos detalladamente en el informe del 20 de diciembre del 2010. En el informe, la Oficina de Asuntos Legales resumió la postura del Comité Evaluador y expresó lo siguiente:

> Maranello no indica específicamente la naturaleza del alegado incumplimiento en los doce asuntos mencionados. Según se ha discutido, ninguna de las propuestas sometidas cumplió estrictamente con todos y cada uno de los requisitos y/o información solicitada en el documento de solicitud de propuestas, aunque en la mayoría de ellas se cumplió sustancialmente con los

---

[50] Apéndice de *O.A.T.*, Informe de Evaluación Técnica, pág. 368.
[51] Apéndice de *O.A.T.*, Informe del 2 de agosto de 2010, págs. 478-480, 488-489; Informe del 12 de noviembre de 2010, págs. 516-520, 531-532; Informe del 20 de diciembre de 2010, págs. 569, 581-585, 603-604.

requisitos fundamentales del RFP. En cada uno de los análisis y resúmenes de las propuestas incluido en el Informe de Evaluación Técnica hay una lista de comentarios sobre aquellos criterios de diseño que no se cumplen o falta información. La evaluación de las propuestas que llevo a cabo el Comité, sin embargo, fue una comparativa y teniendo en cuenta la totalidad de la propuesta presentada. Como ya se ha señalado, los documentos sometidos por cada uno de los proponentes relacionados con el diseño del proyecto son de tipo preliminar y no contienen los detalles que aparecerán más adelante en los documentos de construcción. La falta de alguna información o documento especifico se considerara en la etapa de revisión de diseño final de la propuesta seleccionad. Ninguna de las propuestas recibidas cumplía total y completamente con los requisitos del RFP, incluyendo la propuesta de Maranello.[52]

Según las determinaciones del Comité Evaluador, ni *Bird* ni *Maranello* cumplieron cabalmente con todos los requisitos del *RFP*. El resto de los licitadores tampoco cumplieron con todas las especificaciones requeridas.[53] Somos del criterio que las determinaciones del Comité Evaluador se encuentran sostenidas en los documentos que obran en el expediente de la subasta.

Por ejemplo, en la propuesta de *Bird,* el sistema de aire acondicionado no cumplió con los requisitos del *RFP*. Un sistema similar fue instalado en la *O.A.T.*, por lo que dicho organismo había tenido la oportunidad de evaluar su

---

[52] Apéndice de *O.A.T.*, págs. 603-604; Informe del 2 de agosto de 2010, pág. 488; Informe del 12 de noviembre de 2010, pág. 532.
[53] Apéndice de *O.A.T.*, Informe de Evaluación Técnica, pág. 188; Informe del 12 de noviembre de 2010, pág. 522; Informe del 20 de diciembre de 2010, págs. 603-604.

funcionamiento.[54] Tampoco sometió una descripción detallada del sistema de aire acondicionado, ya que los planos -al igual que el resto de las propuestas- fueron esquemáticos. De igual forma, en el Informe de Evaluación Técnica se especificó que *Bird* no especificó los materiales que utilizaría en los sistemas electrónicos, plomería y mecánicos.[55]

Otro ejemplo del incumplimiento con los requisitos del *RFP* fue que *Bird* proveyó un espacio de estacionamiento abierto para los vehículos oficiales, pero en el *RFP* se requirió que este espacio fuera cerrado.[56] *Bird* tampoco proveyó una explicación que validara algunas de sus respuestas en el formulario de *Green Building*, donde obtuvo una certificación plata.[57] Incluso, los planos eléctricos y mecánicos tenían letras en tamaño tan reducido que resultaron difícil leer y entenderlos. Por otro lado, aunque *Bird* detalló el número de elevadores, el consultor externo expresó que "durante la etapa de diseño, si es que se selecciona esta propuesta, se podrá definir el cumplimiento con los otros requisitos del RFP."[58]

---

[54] Apéndice de *O.A.T.*, Informe de Evaluación Técnica, pág. 249; Informe de 2 de agosto de 2010, págs. 478-479; Informe del 12 de noviembre de 2010, págs. 517, 522.
[55] Apéndice de *O.A.T.*, Informe de Evaluación Técnica, pág. 246.
[56] Apéndice de *O.A.T.*, Informe de Evaluación Técnica, págs. 242, 249 y 256.
[57] Apéndice de *O.A.T.*, Informe de Evaluación Técnica, pág. 243.
[58] En el informe también se especificó que en la propuesta de *Bird* no aparecía información sobre la protección de fuego. Tampoco sometió el memorial civil, el memorial estructural, el memorial eléctrico o la relación de áreas y uso, entre otras especificaciones. Véase: Apéndice de *O.A.T.*, págs. 249, 250, 255.

*Maranello* tampoco cumplió con todas las especificaciones del *RFP.* Por ejemplo, el consultor externo de la *O.A.T.* señaló que de escogerse esta propuesta, era necesario que se realizara unos ajustes en la distribución de algunos espacios del edificio.[59] *Maranello* tampoco sometió los planos que mostraban la distribución e iluminación del edificio y omitió ciertos aspectos relacionados a la escorrentía pluvial, entre otras especificaciones. Su memorial estructural fue limitado y no sometió los planos estructurales.[60] De igual forma, en el informe del 2 de agosto de 2010, el Comité Evaluador determinó que algunos de los créditos que *Maranello* reclamó para la obtención de la clasificación de *Green Building*, no le aplicaban.[61]

Los ejemplos señalados evidencian que no se requería que los proponentes detallaran todas y cada una de las especificaciones y aspectos técnicos de sus propuestas. Incluso, el *RFP* limitó la cantidad de páginas que debían incluirse en la propuesta a 20 hojas. También se limitó la cantidad de planos.[62] El cumplimiento con el límite de páginas y los planos requeridos fue validado por el Comité Evaluador. Por ejemplo, del Informe de Evaluación Técnica surge que no se consideró aquellos planos que *Bird* sometió

---

[59] Apéndice de *O.A.T.,* Informe de Evaluación Técnica, págs. 323 y 330.
[60] Apéndice de *O.A.T.,* Informe de Evaluación Técnica, págs. 324, 330 y 331.
[61] Apéndice de *O.A.T.,* pág. 489.
[62] Apéndice de *O.A.T.,* pág. 19.

en exceso al número de planos permitidos por el *RFP*.[63] De

igual forma, *STZ* no sometió los detalles de la alternativa

de acero y hormigón en la construcción del estacionamiento

ante la limitación en la cantidad de las páginas

requeridas por el *RFP.*

El expediente demuestra que desde el inicio del proceso

de evaluación, el consultor externo de la *O.A.T.* tomó en

consideración el hecho de que los planos y documentos que

se sometieron en las propuestas fueron esquemáticos. Así

surge del Informe de Evaluación Técnica, donde se incluyó

un listado de las consideraciones generales que se

realizaron cuando se compararon las propuestas. Los

señalamientos al respecto fueron las siguientes:

### 5. Consideraciones hechas en el estudio

5.1 Todas las propuestas sometidas incluyen información descriptiva, incluyendo escrito y planos.

5.2 Debido a que los planos preparados son de carácter esquemático, no muestran toda la información necesaria para una evaluación detallada.

5.3 En algunas propuestas la información sometida no es suficiente para la evaluación preliminar y se enumeran en los comentarios de cada propuesta. Durante la etapa de negociación con el proponente que se seleccione, será necesario discutir en detalle varios aspectos, para asegurarse que se cumplen las necesidades de la OAT.

5.4 No se ha evaluado si las propuestas cumplen con todas las disposiciones de los reglamentos aplicables, ya que debido a ser documentos esquemáticos no se incluye toda la información necesaria. En la etapa de negociación

---

[63] Apéndice de *O.A.T.,* Informe de Evaluación Técnica, pág. 246.

con el licitador seleccionado, se requerirá el cumplimiento con los reglamentos aplicables.

………..
(Citas omitidas.)[64]

No empece a estas consideraciones, el ingeniero Herrera (asesor externo de la *O.A.T.*) evaluó las propuestas y concluyó que la mayoría de ellas cumplieron *sustancialmente* con los requerimientos del *RFP*.[65] Lo anterior evidencia que desde el inicio del proceso, se consideró que aunque la información que se incluyó en las propuesta fueron preliminares y esquemáticas, fueron suficientes para evaluarlas. De hecho, en los informe del Comité Evaluador y en el *RFP* se estableció que los detalles de las especificaciones técnicas del proyecto se discutirían con el proponente seleccionado en la etapa de la negociación y diseño del proyecto. Así lo demuestra la instrucción núm. 11 del *RFP,* donde se estableció el procedimiento que la *OAT* seguiría, una vez se anunciara el orden de preferencia para la negociación del proyecto. Sobre este particular, se indicó lo siguiente:

La Oficina de Administración de los Tribunales otorgará la propuesta en forma condicionada a uno de los proponentes. Posterior al otorgamiento se iniciará un proceso de negociación para:

a. Revisar los aspectos específicos del proyecto.

b. Después de confirmados, revisados y establecido el cumplimiento de todos los requisitos y criterios, se determina si la

---

[64] Apéndice del alegato de *O.A.T.,* Informe de Evaluación Técnica, pág. 188.
[65] Apéndice del alegato de *O.A.T.,* Informe de Evaluación Técnica, págs. 374-375.

Oficina de Administración de los Tribunales y el proponente o desarrollador seleccionado están en posición de negociar un contrato.

c. Si durante el proceso de negociación con el proponente o desarrollador seleccionado se encuentra que hay un obstáculo, impedimento o dificultad que no permita la continuación de la negociación, la Oficina de Administración de los Tribunales recurrirá al segundo proponente o desarrollador para iniciar nuevamente el proceso de negociación, o se cancela la Solicitud Propuesta en su totalidad.

d. La fecha de confirmación de todos los requisitos necesarios para la contratación, incluyendo el título u opción de compra del terreno, revisión de todos los elementos de construcción y financiamiento, canon de arrendamiento, aprobaciones y permisos iniciales requeridos, será determinada más adelante en el proceso.

e. Una vez finalizadas las negociaciones, los acuerdos se incluirán en el contrato para el desarrollo, construcción y arrendamiento del Nuevo Centro Judicial de Aibonito.[66]

Un examen del expediente revela que el Comité Evaluador evaluó la información que proveyó cada licitador en torno a los materiales y la consideró suficiente para designar las puntuaciones en este criterio.[67] A diferencia de una subasta formal, el *RFP* permite un proceso activo de negociación entre las partes y un mayor grado de flexibilidad para atender los asuntos específicos y cuestiones técnicas del proyecto. No hemos encontrado

---

[66] Apéndice de *O.A.T.*, pág. 16.
[67] Apéndice de *O.A.T.*, Informe del 12 de noviembre de 2010, págs. 520, 536.

fundamento para variar las puntuaciones asignadas por la
*O.A.T.* en este criterio. El error no se cometió.

   *c.* *Evidencia sobre la posesión del terreno*

   *Maranello* alega que el *RFP* requirió que los proponentes
evidenciaran la posesión del terreno, por medio de una
certificación registral o un contrato de opción de
compraventa. Sostiene que *STZ* no cumplió con este
requisito, ya que sometió un contrato de promesa de
compraventa cuya fecha de vencimiento fue el 31 de mayo de
2010. Argumenta que al momento de adjudicarse el orden de
preferencia, a saber, el 14 de junio de 2010, *STZ* no
contaba con un contrato que estuviera vigente, ni tampoco
evidenció su renovación.[68] No le asiste la razón en sus
planteamientos.

   Según las especificaciones del *RFP*, el proponente o
desarrollador tenía que incluir en la propuesta "terrenos
en su posesión, opcionados o a comprar que sean accesibles
a las vías públicas principales de la ciudad de
Aibonito."[69] Conforme a la instrucción núm. 11 del *RFP*, una
vez se iniciara el proceso de negociación con el
proponente seleccionado, "[l]a fecha de confirmación de
todos los requisitos necesarios para la contratación,
<u>incluyendo el título u opción de compra del terreno</u>, ….
será determinada más adelante en el proceso."

---

[68] Los argumentos de *Maranello* en cuanto a la falta de evidencia sobre
la posesión del terreno no se incluyeron en la solicitud de
reconsideración que presentó en la *O.A.T.* Es un planteamiento que se
hace por primera vez en su recurso de revisión.
[69] Apéndice de *O.A.T.*, pág. 6.

Si bien es cierto que el proponente, al momento de presentar la propuesta, tenía que demostrar que los terrenos estaban disponibles para ser adquiridos, la etapa donde se tiene que corroborar el título u opción de compraventa del terreno es luego de que se inicie la etapa de la negociación y diseño, según el orden de preferencia designado.

*STZ* tenía vigente un contrato de promesa de compraventa para la fecha en que presentó su propuesta y cumplió con las especificaciones del *RFP*. La renovación del contrato o los documentos que evidencien la titularidad del terreno, se presentarán en la etapa de la negociación y diseño del proyecto. Si no se cumple con este requisito, la *O.A.T.* podrá negociar el proyecto con el próximo proponente en la lista de preferencias.

9. Monto del canon de arrendamiento

a. *Comparación entre la oferta de Maranello y la de STZ*

Conforme al *RFP* el canon de arrendamiento fue uno de los 10 criterios que se consideraron cuando se evaluaron las propuestas. En el *RFP* se especificó que, luego de 30 años de arrendamiento, la Rama Judicial tendría el derecho de adquirir las nuevas facilidades del Centro Judicial de Aibonito.[70] Por lo tanto, el proponente sería responsable de "preparar y someter un diseño preliminar con sus proyecciones de costo de construcción y de financiamiento. Esto, unido al costo del terreno y otros aspectos

---

[70] Apéndice de *O.A.T.*, pág. 6.

económicos, le permitirá establecer el canon de arrendamiento por pie cuadrado que ofrecerá en su propuesta."[71] La complejidad del proyecto requería que el Comité Evaluador analizara el precio del canon de arrendamiento tomando en consideración varios factores, entre estos, los pies cuadrados del edificio del tribunal, el espacio y la calidad del estacionamiento, el canon de mantenimiento, entre otros aspectos.

Los documentos sometidos ante nuestra consideración reflejan que algunas de las propuestas incluyeron edificios de estacionamientos, mientras que otras incluyeron estacionamientos en superficie o una combinación de estacionamientos en superficie y de estacionamientos techados. De igual forma, algunos proponentes ofrecieron un canon de arrendamiento por el edificio del tribunal y un canon de arrendamiento por el edificio de estacionamiento (multipisos), o por el estacionamiento en superficie.[72]

*STZ* propuso un canon de arrendamiento mensual de $624,735 y una renta anual de $7,496,820 (ambas partidas incluyeron el componente del mantenimiento que totalizó $888,324).[73] No obstante, *STZ* dividió el monto del componente financiero por el pie cuadrado en dos partes: (1) el edificio principal, y (2) el edificio del estacionamiento. La renta por el pie cuadrado del edificio

---

[71] Apéndice de *O.A.T.*, pág. 10.
[72] Apéndice de *O.A.T.*, Informe de Evaluación Técnica, pág. 191.
[73] Apéndice de *O.A.T.*, Informe de Evaluación Técnica, pág. 365.

principal, sin el costo de mantenimiento, sería de $24.50, mientras que la renta del edificio de estacionamiento sería de $16. Los pies cuadrados del área rentable sería de 171,731 p/c, más 150,068 p/c por el edificio de estacionamiento.[74]

*Maranello*, por su parte, propuso un canon de arrendamiento mensual de $441,475, y un canon de arrendamiento anual de $5,297,700. Su oferta incluyó el arrendamiento del edificio principal y la renta del estacionamiento terrero. El costo por el pie cuadrado sería de $30 y el área rentable sería de 176,590 p/c.[75]

En el recurso de revisión, *Maranello* argumentó que su oferta es más económica que la oferta de *STZ*. Para sustentar sus planteamientos, *Maranello* comparó la renta que se pagaría durante los 30 años de arrendamiento de las facilidades bajo la oferta de *STZ,* y el monto que se pagaría si se escogiera su oferta. Alegó que la diferencia entre ambas ofertas sería de $65,973,600, por lo que la oferta de *STZ* sería 42% más costosa que su oferta.[76]

La *O.A.T.*, por su parte, señaló que el cálculo de *Maranello* es incorrecto, ya que el costo por el pie cuadrado de las facilidades donde se ubicaría el tribunal, si se excluye el edificio de estacionamiento, sería de $24.50 en la propuesta de *STZ*, mientras que en la oferta

---

[74] Apéndice de *O.A.T.*, Informe de Evaluación Técnica, pág. 372; Informe del 20 de diciembre de 2010, pág. 563.
[75] Apéndice de *O.A.T.*, Informe de Evaluación Técnica, págs. 328, 372.
[76] Los argumentos de *Maranello* sobre la diferencia en el cómputo de ambas ofertas no fueron consideradas por el Comité Evaluador, ya que los planteamientos en torno a este asunto se presentan por primera vez en el recurso de revisión.

de *Maranello* sería de $30. Ahora bien, la *O.A.T.* aclara que *Maranello* incluyó el costo del mantenimiento en la renta por pie cuadrado, mientras que en la oferta inicial del edificio principal de *STZ* no se incluyó el mantenimiento. Aun así, la *O.A.T.* alega que, en caso de que se adjudique la partida de mantenimiento de *STZ* en su totalidad al edificio del tribunal, cuya cifra sería de $888,324, el canon por el pie cuadrado del edificio principal con el mantenimiento (excluyendo el edificio de estacionamiento), sería de $29.67.[77] Además, alega que el canon de mantenimiento en la oferta de *STZ* es mayor porque incluyó un edificio de estacionamiento, mientras que en la oferta de *Maranello* solo se propuso un estacionamiento exterior en la superficie y a la intemperie, que conlleva un menor costo de mantenimiento.

El expediente refleja que el Comité Evaluador evaluó detalladamente los costos de arrendamiento de las facilidades y asignó la puntuación más alta a la propuesta que sometió el canon de arrendamiento más ventajoso, y en forma descendiente, por orden de cuantía, a los demás proponentes".[78] Como cuestión de hecho, el Comité Evaluador evaluó el canon de arrendamiento que se pagaría bajo la propuesta de *STZ* por el edificio de estacionamiento y lo incluyó en el costo total del canon mensual y anual del

---

[77] Alegato de la *O.A.T.*, págs. 45-46.
[78] Apéndice de *O.A.T.*, Informe del 12 de noviembre de 2010, pág. 522.

arrendamiento del nuevo centro judicial.[79] Aun así, el Comité Evaluador le asignó a *Maranello* la puntuación máxima de 10 puntos, mientras que *STZ* solo obtuvo 4 puntos. *Bird* obtuvo 2 puntos porque su propuesta fue más costosa y *Roig* obtuvo 5 puntos.

Lo anterior evidencia que las puntuaciones que se asignaron en el criterio del monto del canon de arrendamiento tomó en consideración la cuantía del arrendamiento que propuso cada licitador. Así, la oferta de *Maranello* recibió una puntuación mayor por ser una oferta más económica, mientras que *Bird* recibió una menor puntuación por ser una oferta más costosa. La evaluación también demuestra que *Maranello* recibió una puntuación más alta que *STZ*, lo que evidencia que las cuantías del monto del canon de arrendamiento fueron consideradas por la *O.A.T.* al momento de evaluar este criterio.

*Maranello*, sin embargo, señala que la *OAT* actuó arbitrariamente al asignar solo un 10% de valor al criterio del precio. Argumentó que la *O.A.T.* no podía otorgarle al precio los mismos puntos que se otorgaron en los otros criterios, porque esta valoración disminuyó el propósito principal de una subasta, cuyo fin es que el Estado consiga realizar la obra al precio más bajo posible.

Ciertamente, si se le asigna al criterio del precio un porcentaje mayor al 10% del total de la evaluación,

---

[79] Apéndice de *O.A.T.*, pág. 526.

*Maranello* obtendría mayor ventaja, ya que fue el proponente que obtuvo la puntuación máxima en este criterio. De hecho, en el proceso de reconsideración, *Maranello* propuso que el Comité Evaluador asignara al criterio del precio un 25% del valor total de la evaluación, en vez de un 10%. Ante tales planteamientos, el Comité Evaluador concluyó lo siguiente:

> Luego de una evaluación de distintas posibilidades, la OAT determinó que todos y cada uno de los diez criterios de evaluación establecidos debía tener el mismo peso. Ciertamente el criterio del monto del canon de arrendamiento es uno de suma importancia pero, tratándose de una instalación de la importancia de un centro judicial regional, del hecho de que el mismo se desarrollará mediante un contrato de arrendamiento a largo plazo y que el edificio pasará a manos de la OAT al final del término de arrendamiento, la importancia de la administración adecuada y el mantenimiento óptimo y eficiente del centro, la necesidad de calidad de su diseño y construcción, entr[e] otros factores, hacen necesario que cada una de las propuestas se evalúen de acuerdo con el cumplimiento de cada uno de los criterios establecidos en el documento de solicitud de propuestas (RFP) y que dichos criterios tengan las(sic) misma importancia.[80]

Por lo tanto, aunque *Maranello* obtuvo la máxima puntuación en el criterio del monto del canon de arrendamiento, este criterio solo fue 1 de los 10 criterios que el Comité Evaluador tomó en consideración para examinar las propuestas. La propuesta de *Maranello* obtuvo una menor puntuación en comparación con la

---

[80] Apéndice de *O.A.T.*, Informe de 12 de noviembre de 2010, pág. 534. *Véase*, además, Informe del 2 de agosto de 2010, pág. 490; Informe del 12 de noviembre de 2010, pág. 522; Informe del 20 de diciembre de 2010, pág. 606.

propuesta de *STZ* en 7 de los 10 criterios que se evaluaron.

El canon de arrendamiento de *STZ* aparentaba ser más costoso que la oferta de *Maranello,* pero el Comité Evaluador tomó en consideración otros criterios para asignar el orden de preferencia. Los criterios se aplicaron por igual a todos los participantes. La complejidad y sofisticación del proyecto requiere extremo cuidado. Al asignar las puntuaciones, el Comité Evaluador consideró la calidad y el diseño del edificio de estacionamientos, el costo por el pie cuadrado del edificio principal y el resto de los criterios objetivos que se establecieron en el *RFP*. Una vez se evaluaron todos los criterios, la *O.A.T.* asignó el primer lugar en el orden de preferencia a *STZ,* puesto que su propuesta fue la más ventajosa y beneficiosa para la construcción del nuevo Centro Judicial de Aibonito. No encontramos arbitrariedad en las puntuaciones asignadas por el monto del canon de arrendamiento.

Si bien es cierto que el propósito de la subasta es lograr que el Gobierno consiga los precios más bajos, no existe una regla inflexible que exija adjudicar la subasta al postor más bajo. La agencia está facultada para rechazar la oferta más baja siempre que su determinación sea razonable. *Empresas Toledo v. Junta de Subastas*, supra, pág. 779. El mero hecho de que un licitador comparezca a una subasta y ofrezca un precio más bajo que

los demás licitadores, de ninguna forma garantiza que la subasta le sea adjudicada. Existen otros factores que deben ser considerados. Especialmente, cuando se trata de un edificio que albergará las salas judiciales de una Región y que se planifica para que dure por varias decenas de años.

Los documentos sometidos ante nuestra consideración reflejan que los aspectos técnicos, las especificaciones, los servicios y los equipos de cada propuesta fueron evaluados conjuntamente por el consultor externo de la *O.A.T.,* el Comité Evaluador y la Oficina de Asuntos Legales. La evaluación de las propuestas requirió un minucioso análisis de cada propuesta, más un estudio comparativo con los 10 criterios especificados en el *RFP.* Tomando en consideración los 10 criterios del *RFP*, la *O.A.T.* concluyó que la propuesta de *STZ* fue la más beneficiosa.

El *expertise* que la *O.A.T.* ejerció al analizar los criterios de un proyecto tan complejo como es el nuevo Centro Judicial de Aibonito, el cual incluye el diseño, construcción, financiamiento y el arrendamiento de las nuevas facilidades, no debe ser sustituido por nuestro criterio sin tener una clara justificación".[81]

IV

---

[81] Véase, Sentencia del Tribunal de Apelaciones, <u>Maranello, Inc.; Bird Interplan Development Group, LLC v. O.A.T.</u>, KLRA201100013 y KLRA201100024, págs. 20-66.

Luego de examinar los errores planteados por los peticionarios, es necesario concluir que debido a que en el proceso de evaluación de las propuestas presentadas para el desarrollo del nuevo Centro Judicial de Aibonito hubo que evaluar productos diferentes, con diseños distintos, requerimiento de permisos distintos, costos distintos, experiencia de los desarrolladores distintas, propuestas de mantenimiento y operación distintas, y localizaciones distintas, **resulta imposible evaluarlos únicamente a base del precio propuesto por cada proponente.**

Si bien es cierto que el propósito de la subasta es lograr que el Gobierno consiga los precios más económicos, no existe una regla inflexible que exija adjudicar la subasta al postor más bajo. La agencia está facultada para rechazar la oferta más baja siempre que su determinación sea razonable. Empresas Toledo v. Junta de Subastas, supra, pág. 779.

En el caso de autos, Maranello argumenta en su recurso que fue el postor más bajo y que el precio de STZ era 42% por encima del suyo. Esta aseveración parte de una premisa equivocada, pues resulta que el proyecto de Maranello tiene menos pies cuadrados de construcción que el de STZ. Además, de acuerdo al Informe Técnico, el canon por pie cuadrado propuesto por Maranello es de $30.00, mientras que el canon equivalente en la propuesta de STZ es de $24.50.[82]

---

[82] Apéndice de la O.A.T., pág. 372.

Cabe señalar que el proceso de RFP validado por esta Curia en R&B Power, Inc. v. E.L.A., supra, no requiere que se haga un ejercicio exclusivamente matemático para evaluar las propuestas con el fin de establecer el orden de preferencia en la negociación. En este caso, se trata de productos que, debido a sus características peculiares, no son susceptibles de evaluarse con precisión matemática. Precisamente esta fue la razón para que la O.A.T. utilizara el proceso de RFP para llevar a cabo la compra negociada para el desarrollo del nuevo Centro Judicial de Aibonito.

Contrario a lo que expresa la Opinión disidente, este Tribunal no ignora los Informes de Auditoría del Contralor de Puerto Rico DA-12-52[83] y DA-12-53[84]. Estos informes van dirigidos a analizar los cánones de arrendamiento del edificio de la OAT, el Tribunal de Apelaciones y la Sala de Relaciones de Familia y Menores del Municipio de Bayamón. Por lo tanto, responden a unos señalamientos e inquietudes que surgieron con anterioridad y que nada tienen que ver con el proyecto actualmente en controversia. De hecho, a pesar de que la propuesta de STZ no obtuvo la mejor puntuación en el criterio de costo de arrendamiento, esta sí resultó favorecida en otros criterios de evaluación y cumplió con todas las exigencias de ley.

---

[83] El Informe de Auditoría DA-12-52 de 19 de marzo de 2012 incluye el periodo auditado correspondiente desde el 1 de julio de 1998 al 30 de junio de 2008.
http://www.ocpr.gov.pr/informes_en_PDF/pdf_2011_2012/da/DA-12-52.pdf.
[84] El Informe de Auditoría DA-12-53 de 19 de marzo de 2012 incluye el periodo auditado correspondiente desde el 1 de julio de 1998 al 31 de diciembre de 2007.
http://www.ocpr.gov.pr/informes_en_PDF/pdf_2011_2012/da/DA-12-53.pdf.

La extensa documentación sometida ante este Tribunal y el Tribunal de Apelaciones refleja que los aspectos técnicos, las especificaciones, los servicios y los equipos de cada propuesta fueron evaluados conjuntamente por el consultor externo de la O.A.T., el Comité Evaluador y la Oficina de Asuntos Legales. La evaluación de la propuesta requirió un minucioso análisis de cada una de ellas, más un estudio comparativo de los 10 criterios del RFP. La O.A.T. concluyó que la propuesta de STZ fue la más beneficiosa.[85] El récord demuestra que el proceso de RFP llevado a cabo por la O.A.T. fue uno meticuloso, cuidadoso y equitativo conducido con el claro objetivo de identificar la propuesta más conveniente para la Rama Judicial de Puerto Rico y ajustada a las necesidades de la ciudadanía y las comunidades a las que sirve la Región Judicial de Aibonito. Por esta razón, su determinación no debe ser sustituida por este Tribunal en ausencia de una clara justificación para ello.

V

Por los fundamentos antes expuestos, confirmamos la sentencia recurrida. En consecuencia, se sostiene el orden de preferencia para la negociación del nuevo Centro Judicial de Aibonito, tal y como fue alterada por el

---

[85] Véase: Informe de Evaluación Técnica, Apéndice del Memorando de la O.A.T., págs. 182-375. Véanse, también, los informes del Comité Evaluador para examinar las solicitudes de reconsideración del 2 de agosto de 2010, Apéndice del Memorando de la O.A.T., págs. 473-491; y otro del 12 de noviembre de 2010, Apéndice del Memorando de la O.A.T., págs. 514-537; así como los Informes y Recomendaciones de la Oficina de Asuntos Legales de la O.A.T., págs. 540-611.

Tribunal de Apelaciones; y así modificada, se confirman las determinaciones de la O.A.T.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal Supremo. La Jueza Asociada señora Pabón Charneco emitió una Opinión Disidente a la cual se une el Juez Asociado señor Feliberti Cintrón. El Juez Presidente señor Hernández Denton está inhibido.


                        Aida I. Oquendo Graulau
                     Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Maranello, Inc.<br><br>    Peticionario<br><br>       v.<br><br>Oficina de Administración de los Tribunales<br><br>    Recurrida<hr>Bird Interplan Development Group, LLC<br><br>    Peticionario<br><br>       v.<br><br>Oficina de Administración de los Tribunales<br><br>    Recurrida | CC-2011-892<br>cons. con<br>CC-2011-895 | Certiorari |

Opinión disidente emitida por la Jueza Asociada señora Pabón Charneco a la cual se une el Juez Asociado señor Feliberti Cintrón

En San Juan, Puerto Rico, a 26 de septiembre de 2012.

Escribo este disenso con un sentido de gran consternación. Escudándose con un derrame de tinta a través de sesenta y nueve (69) páginas, una mayoría de este Tribunal intenta asfixiar un despilfarro millonario de fondos públicos. En el camino, hoy el Tribunal convierte la "discreción" en un acto arbitrario y la "deferencia judicial" en un ejercicio de sumisión miope. Irónicamente, el principio de sana administración que con vehemencia particular ha sido aplicado por este Tribunal a

las otras ramas del gobierno, se convierte hoy en un actor destituido, silente y, en fin, ausente de la administración de la Rama Judicial. Se trata verdaderamente de la institucionalización de una "segunda vara" para medir los actos de administración en la Rama Judicial.

Mi conciencia me impide avalar un procedimiento de contratación en el cual esta Rama terminará pagando una cantidad millonaria de dinero en exceso, en comparación con otras alternativas. Hace escasamente unas semanas este Tribunal expresó que "la dama de la justicia es ciega, no ingenua", *PIP v. ELA et al.*, res. en 6 de julio de 2012, 186 D.P.R. ___ (2012), 2012 T.S.P.R. 111; 2012 J.T.S. 124. Con la decisión a la que se llega hoy, la ingenuidad encuentra un hueco por el cual inmiscuirse sigilosamente en al ámbito de la administración de la Justicia. Ello a cuentas de la credibilidad de nuestra Rama Judicial. Ante este escenario dantesco, el disenso es un imperativo moral.

I

La idea de construir un nuevo Centro Judicial de Aibonito surgió a raíz de un Informe relacionado a la Reforma Judicial de 2003.[86] La razón para ello fue que el Centro Judicial existente tiene limitaciones de

---

[86] Informe titulado "Análisis y Actualización de las Recomendaciones sobre las Sedes Municipales y la Configuración de las Regiones Judiciales", abril de 2006.

crecimiento.[87] A tales fines, en el Plan Estratégico 2007-2011, se proyectó la construcción de las nuevas instalaciones del Centro Judicial de Aibonito. La Oficina de la Administración de los Tribunales (en adelante OAT) llevó a cabo un proceso interno desde junio de 2008, dirigido a identificar las características que debía tener el mencionado Centro Judicial. El 28 de julio de 2009, la OAT publicó una solicitud de propuestas (*Request for Proposal,* en adelante *RFP*) para diseñar, construir, financiar y arrendar las nuevas instalaciones del Centro Judicial de Aibonito.

En el *RFP* se detallaron los requisitos de la propuesta como, por ejemplo, especificaciones de diseño, seguridad, materiales de construcción, entre otros. Asimismo, la OAT publicó los criterios de evaluación que utilizaría el Comité Evaluador para analizar cada propuesta. Estos criterios son: ubicación o localización del terreno; amplitud o tamaño del terreno; calidad y funcionalidad en el diseño y construcción; uso de materiales de primera calidad; capacidad de estacionamiento para funcionarios y público; tiempo de construcción; monto del canon de arrendamiento por pies cuadrado; historial de cumplimiento del desarrollador en otros proyectos similares realizados; estructura administrativa y recursos del programa de mantenimiento; y, por último, Certificación del edificio como "Green Building".

---

[87] CC-2011-892, Ap. Alegato OAT, pág. 649.

La OAT en un principio se limitó a indicar que el orden de los criterios anteriormente esbozados no debía entenderse necesariamente como uno de orden de prioridad. Ello se debió a que la decisión de cuál criterio tendría prioridad sobre el otro iba a ser tomada **luego** de sometidas las propuestas. No obstante, posteriormente, y luego de sometidas las propuestas, el Comité Evaluador asignó un valor de diez por ciento (10%) a cada uno de los diez (10) criterios a evaluar. Esto es sin orden de preferencia alguno.

El Comité Evaluador estuvo compuesto por los siguientes funcionarios: Ing. José F. Moreno Navarro, Administrador de la División de Locales y Servicios Especiales de la OAT, como su presidente; Hon. Rafael E. Taboas Dávila, Juez Administrador Regional, Centro Judicial de Aibonito; Hon. Ángel Colón Pérez, Ayudante Especial del Juez Presidente; Sr. William Pando Reyes, Director de Administración de OAT; Lcda. Gina Méndez Miró, entonces Directora de Programas Judiciales; Lcdo. Miguel Ferrer Rivera, Director de Operaciones de la OAT; Sra. Maritza Castillo Trilla, Directora de la Oficina de Planificación, Presupuesto y Recursos Externos de la OAT. Además, el Comité contó con el Ing. Ángel Herrera Blanco, como Asesor Externo. Constituido el Comité, la evaluación preliminar de cada propuesta fue delegada a su Presidente, ingeniero Moreno Navarro, junto al Asesor Externo, ingeniero Herrera Blanco. Como bien se expone en la

Sentencia de este Tribunal, el 23 de diciembre de 2010, la OAT notificó un orden de preferencia en la negociación del proyecto.[88] En efecto, en esta notificación se dio a conocer que STZ obtuvo mejor evaluación que el resto de los proponentes y, por consiguiente, sería el primero en turno para negociar con la OAT el desarrollo del proyecto.

Inconformes, Maranello y Bird, y con argumentos similares a los que levantan ante este Tribunal-detallados en la Sentencia que antecede-, instaron sus respectivos recursos de revisión ante el Tribunal de Apelaciones. El tribunal *a quo* resolvió que el proponente STZ obtuvo ochenta y dos (82) puntos; seguido por Maranello con setenta y seis (76) puntos; y Bird, en tercer lugar con setenta y cinco (75) puntos.[89]

Inconformes con el resultado, Maranello y Bird presentaron sus respectivos recursos de *Certiorari* ante nos.

## II

Aunque en Puerto Rico no existe legislación que regule el procedimiento de adquisición de bienes y servicios para entidades gubernamentales, hemos reiterado que estos procedimientos "están revestidos de un gran interés

---

[88] El orden fue el siguiente: 1) STZ (ochenta y dos (82) puntos); 2) Roig (setenta y siete (77) puntos); 3) Maranello (setenta y seis (76) puntos); 4) Bird (setenta y cinco (75) puntos); 5) Aibonito Building (sesenta y siete (67) puntos); 6) BluPoint (sesenta y tres (63) puntos); 7) Judicial Center (sesenta y un (61) puntos); 8) ASOMA (cincuenta y cuatro (54) puntos); por último, 9) NORAVI (cincuenta y tres (53) puntos).

[89] En el trámite apelativo, Roig descendió al cuarto lugar, con setenta y tres (73) puntos, seguido de Aibonito Building, BluPoint, Judicial center, ASOMA y NORAVI. Véase Sentencia, pág. 10.

público y aspiran a promover una sana administración pública". *Caribbean Communications v. Pol. de P.R.*, 176 D.P.R. 978, 994 (2009). Véanse, en general, *Costa Azul v. Comisión*, 170 D.P.R. 847 (2007); *A.E.E. v. Maxon*, 163 D.P.R. 434 (2004). Según hemos explicado, este mecanismo busca, en esencia,

> proteger los intereses del pueblo, **procurando conseguir los precios más económicos; evitar el favoritismo, la corrupción, el dispendio, la prevaricación, la extravagancia y el descuido** al otorgarse los contratos, y minimizar los riesgos de incumplimiento. *Caribbean Communications v. Pol. de P.R.*, supra, pág. 994. *Empresas Toledo v. Junta de Subastas,* 168 D.P.R. 771, 778 (2006). [Énfasis suplido].

La subasta formal y la compra negociada[90] son catalogadas como los métodos principales de adquisición gubernamental de bienes y servicios. J.C. McBride, T. J. Thouhey, W.I. Wilson, *Government Contracts: Cyclopedic Guide to Law, Administration, Procedure*, LexisNexis, 2012, Vol. 1B, pág. 9-5. De una parte, la compra negociada se caracteriza por ser un procedimiento mucho más informal y flexible; es ideal para adquisiciones de bienes y servicios "especializados que involucran asuntos técnicos o muy complejos o cuando existen pocos competidores

---

[90] Actualmente el concepto de "compra negociada" se conoce comúnmente como *Request for Proposal* (RFP). Véase C. Tiefer, W.A. Shook, *Government Contract Law in the Twenty-First Century*, Carolina Academic Press, 2012, pág. 80. Específicamente, estos tratadistas señalan lo siguiente: "[t]he method of requesting competitive proposal, principally known by the initial 'RFP' for 'Request for Proposals' and formerly known as 'negotiated procurement' ". . . . No obstante, el *Reglamento de Subastas Formales de Bienes y Servicios* de la Rama Judicial denomina "compra negociada" al método de adquisición de bienes y servicios. Por otro lado, cuando hacemos referencia a un "RFP", hablamos propiamente de la notificación en la que se incluye una solicitud o invitación para someter propuestas.

cualificados". *Caribbean Communications v. Pol. de P.R.*, *supra*, pág. 996; *R & B v. E.L.A.*, 170 D.P.R. 606, 621-622 (2007).

Según el *Reglamento de Subastas Formales de Bienes y Servicios* de la Rama Judicial, la compra negociada es un procedimiento excepcional. Es decir, reconoce que la compra negociada no es un método de compra ordinario; por el contrario, el Reglamento dispone que debe ser utilizado cuando, por ejemplo, "la adquisición de bienes o servicios. . . sean sofisticados, especializados o complejos".[91] Art. XXIV (A)(1), *Reglamento de Subastas Formales de Bienes y Servicios* de la Rama Judicial.

Generalmente, se prefiere la metodología de compra negociada para la adquisición de bienes y servicios técnicos porque la agencia puede utilizar la flexibilidad y discreción de este proceso para considerar una diversidad de factores que pueden llegar a ser, incluso,

---

[91] Art. XXIV (A)(1), *Reglamento de Subastas Formales de Bienes y Servicios* de la Rama Judicial dispone:

La compra negociada es un procedimiento de excepción para:

1. La adquisición de bienes o servicios personales cuando éstos sean sofisticados o especializados o complejos.

2. Los precios cotizados en una subasta formal resulten irrazonablemente altos.

3. Los términos y las ofertas presentadas en una subasta formal resulten onerosos para la Rama Judicial.

4. En los casos antes indicados, el Jefe de Compras recomendará al Director Administrativo que se utilice este procedimiento para la adquisición de los bienes o servicios particulares.

mas importantes que el precio.[92] Sin embargo, desde *R & B v. E.L.A.*, *supra*, advertimos que

> [e]sa flexibilidad. . . no puede convertirse en patente de corso para el dispendio de fondos públicos. . . . Como siempre, será responsabilidad de los tribunales velar por que las agencias y las corporaciones públicas no se conviertan en autócratas en el ejercicio de la facultad extraordinaria concedida, actuando sin parámetros adecuados y exentos de supervisión alguna. *Íd.*, pág. 625.

Desde entonces observamos que la compra negociada otorga a los organismos gubernamentales una discreción tan abarcadora que debía ser regulada para proteger el interés público, asegurar un debido proceso de ley y salvaguardar principios inherentes a los procesos de adquisiciones como lo es la sana administración, la adquisición económica de bienes y servicios y la libre competencia.

Es por ello que cada entidad gubernamental debe limitar su poder delegado de adquisición de bienes y servicios para llevar a cabo procesos de compra que se ajusten al principio de libre competencia, igualdad de condiciones entre los suplidores y transparencia en la contratación y erogación de fondos públicos. J.C. McBride, T. J. Thouhey, W.I. Wilson, *op cit.*, Vol. 1B, pág. 9-9. Véase, en general, *Asoc. Fcias. Com. v. Dpto. de Salud*, 156 D.P.R. 105 (2002). Más importante aún, las

---

[92] Como regla general, estos factores pueden clasificarse en al menos una de cuatro categorías principales: 1) técnicos; 2) administrativos o gerenciales; 3) experiencia e historial de cumplimiento; y 4) precio o costo. S.W. Feldman, *Government Contract Guidebook*, 4ta ed., West, 2011, págs. 181-182.

adquisiciones de bienes y servicios que realiza el gobierno mediante *RFP* están -como cualquier otra subasta gubernamental- revestidas de un gran interés público. Esta doctrina pretende proteger al erario y garantiza que dichas adquisiciones se lleven a cabo con transparencia, eficiencia y probidad. *Caribbean Communications v. Pol. de P.R., supra.*

Al igual que una subasta formal, la compra negociada tiene sus retos y particularidades que deben ser atendidas para ajustarse a los principios señalados. Una de las peculiaridades consiste en que la solicitud de propuesta – *RFP*– debe contener como mínimo: 1) requisitos y especificaciones necesarias para satisfacer las necesidades de la agencia; 2) anticipar de forma general los términos y condiciones del contrato; 3) información requerida en la propuesta; y 4) **factores** y subfactores significativos o importantes **junto a su prioridad o importancia relativa.** C. Tiefer, W.A. Shook, *Government Contract Law in the Twenty-First Century*, Carolina Academic Press, 2012, pág. 80; S.W. Feldman, *op cit.*, pág. 181. Las agencias tienen amplia discreción al diseñar los criterios que utilizarán para la evaluación, siempre que estén razonablemente relacionados con las necesidades de la agencia y que no sean contrarios a las leyes o reglamentos aplicables. Véase J. C. McBride, T. J. Thouhey, W.I. Wilson, *op cit.*, Vol. 1B, pág. 9-13.

No obstante, aun cuando la solicitud de propuesta identifique los criterios de evaluación, la entidad viene obligada a publicar en su solicitud de propuestas los criterios de evaluación *y su prioridad o importancia relativa*. S.W. Feldman, *Government Contract Guidebook*, 4ta ed., West, 2011, pág. 182.[93] Este Tribunal planteó este requisito desde *R & B v. E.L.A.*, *supra*. Específicamente, adoptamos el siguiente señalamiento de los tratadistas McBride y Touhay:

> In addition to the specification, a solicitation for competitive proposals, *must include, at a minimum, a statement of all significant factors and subfactors the government reasonably expects to consider,* **the relative importance assigned to each of these factors and subfactors,** *a statement indicating whether the proposals will be evaluated and awarded with discussions with offerors or without discussions with offerors, and the time and place for submission of proposal. R & B v. E.L.A.*, supra, pág. 622, nota al calce núm. 5, citando 1B *Government Contracts: Cyclopedic Guide to Law, Administration, Procedure* Sec. 9.20[3], pág. 9-10 (Sup. 2007). [Énfasis Suplido].

Sin embargo, ello no se limitó a una nota al calce, sino que recientemente reiteramos esta norma. Así, en *Caribbean Communications v. Pol. de P.R.*, *supra,* resolvimos que

> [l]os requisitos a considerar en la adjudicación del contrato se enumeran en el RFP, *el cual incluye*, entre otros, **el valor que se le asigne**

---

[93] Aunque los factores y su importancia relativa deben plantearse claramente en el *RFP*, el método de rating no tiene que ser divulgado. Véase S. W. Feldman, *op cit.*, pag. 182.

> **a éstos**, el itinerario para recibir y evaluar
> las propuestas, y adjudicar la buena pro, así
> como los términos del contrato. *Íd.*, pág. 996.
> [Énfasis suplido].

Esta regla pretende que la agencia fije de antemano las normas que regirán el proceso de evaluación de propuestas. C. McBride, T. J. Thouhey, W.I. Wilson, *op cit.*, Vol. 1B, pág. 9-34; citando Spectron, Inc., B-172261, 51 Comp. Gen. 153 (1971). Asimismo, tiene el propósito de evitar dar la impresión de que una agencia haga ajustes "a puerta cerrada" en cuanto al peso asignado a cada criterio y así evitar un posible esquema de favoritismo. *A contrario sensu*, **si no existiera esta regla, estos esquemas pueden quedar fácilmente disfrazados bajo la etiqueta de "discreción administrativa", lo que, a su vez, haría virtualmente imposible que los proponentes que tengan razones válidas para impugnar el proceso de subasta, no tengan la prueba suficiente para probar el favoritismo que regularmente viene al mundo de forma solapada. "Después de todo, la dama de la justicia es ciega, no ingenua".** *PIP v. ELA et al.*, supra.

Relacionado a lo anterior, el Auditor General de Estados Unidos ha opinado que cada proponente tiene derecho a saber si la adquisición se otorgará a base de un estándar mínimo de un costo bajo o si el costo es secundario respecto al precio. Esto evita que el proceso de compra negociada se convierta en una apuesta, en lugar de una competencia de propuestas. En este sentido, también

ha señalado que es desventajoso para la competencia de propuestas el que los competidores no tengan una idea de los valores relativos de criterios como el precio y excelencia técnica.[94] S. W. Feldman, *op cit.*, pág. 181.

Así planteado el Derecho aplicable, concentraré mi análisis en los tres (3) fundamentos más sobresalientes por los cuales estoy convencida de que la subasta en cuestión está viciada y, por tanto, debe ser cancelada por el bien del interés público y en virtud de la sana administración de la Rama Judicial. En primer lugar, el Comité Evaluador actuó arbitrariamente al asignar un peso a los distintos criterios de evaluación sin haberlo notificado en el *RFP*. En segundo lugar, el Comité Evaluador erró al asignar puntuaciones sin base o justificación racional en criterios como el de amplitud del terreno y posibilidad de expansión. En tercer lugar, evaluaremos unos hallazgos de la Oficina del Contralor, los cuales impiden avalar una subasta como la de autos.

III

Usualmente este Tribunal revisa las adquisiciones de la Rama Ejecutiva. No obstante, en esta ocasión tenemos la oportunidad de examinar una adquisición de la rama gubernamental de la que somos parte: la Rama Judicial.

---

[94] "Competition would not be served if offerors were not given any idea of the relative values of technical excellence and price". S. W. Feldman, *op cit.*, pág. 181.

Primeramente, uno de los proponentes perdidoso alega que la OAT actuó arbitraria y caprichosamente al notificar la asignación de un peso o importancia de diez por ciento (10%) a cada uno de los criterios de evaluación. Además, señala que, como regla general, el criterio principal de las subastas es el precio pues se busca hacer la obra al precio más bajo posible. *Justiniano v. E.L.A.*, 100 D.P.R. 334, 338 (1971). Por último, argumenta que la práctica de asignar peso a cada criterio de evaluación "al menos debe levantar suspicacia pues con ello se favorece o perjudica a determinados licitadores; lo que milita contra la transparencia".[95]

*A contrario sensu*, la OAT arguye, **alejándose de nuestros pronunciamientos**, que la flexibilidad del procedimiento de *RFP* "solo exige que los proponentes conozcan los criterios a base de los cuales la agencia evaluará las propuestas".[96] El Comité indica que decidió asignar un mismo peso para cada uno de los criterios luego de analizar y evaluar distintas posibilidades y en consideración a la importancia que tienen todos los criterios tales como la ubicación del Centro Judicial de Aibonito, su diseño y la experiencia que se requiere para desarrollarlo y administrarlo.[97] Además, en cuanto al criterio del canon de arrendamiento, señalan que es uno de

---

[95] Petición de *Certiorari* de Maranello, Inc., ante este Tribunal, pág. 6.

[96] Alegato en Oposición a Recurso de *Certiorari* Maranello, ante este Tribunal, pág. 17.

[97] *Íd*.

suma importancia, pero considerando que tiene que ver con un centro judicial regional y que el edificio pasará a manos de la OAT al final del término de arrendamiento, la calidad y mantenimiento, entre otros factores, tienen igual importancia.

En este caso, aunque la OAT asignó un peso igual a cada criterio, los hechos indican que esto ocurrió con posterioridad a que las propuestas fueran sometidas y evaluadas. Si bien es cierto que una agencia puede razonablemente determinar el peso o importancia que le asignará a cada criterio de evaluación, esta información debe ser publicada en el *RFP*. Esto evita que se puedan levantar reclamos sobre la sana administración de la OAT. Además, la notificación del peso o importancia de cada criterio propicia que cada proponente compita en igualdad de condiciones al momento de crear su propuesta de modo que pueda ajustar su propuesta según la importancia establecida de antemano para cada criterio.

Si bien es cierto que, como señala la mayoría de este Tribunal, "no existe una regla inflexible que exija adjudicar la subasta al postor mas bajo",[98] no es menos cierto que asignar porcentajes o pesos a los criterios de evaluación tras bastidores, es una práctica indeseable que crea, como mínimo, suspicacia sobre la transparencia del proceso llevado a cabo por la OAT. No importa que fueran pesos iguales pues cualquier combinación puede ser

---

[98] Sentencia, pág. 65.

utilizada para subir o bajar la importancia de criterios para así favorecer las fortalezas o minimizar las debilidades de una propuesta. Nuevamente, **"la dama de la justicia es ciega, no ingenua"**. *PIP v. ELA et al.*, *supra*. Además, la falta de notificación en el *RFP* del peso que se le asignará a cada criterio, perjudicó el interés público y la competencia al no promover que los proponentes pudieran darle más o menos importancia a uno o varios de los factores.

En vista del razonamiento que antecede, soy de la opinión que el Comité Evaluador y la OAT actuaron arbitraria y caprichosamente al no asignar y notificar en el *RFP* el valor o peso de cada criterio. A diferencia de la mayoría de este Tribunal, estoy convencida de que por el bien del interés público y la sana administración de la Rama Judicial, la OAT debió cancelar la solicitud de propuestas; es decir, debió hacer buen uso del Artículo XXII(H) del *Reglamento de Subastas Formales de Bienes y Servicios* de la Rama Judicial, el cual le reserva el derecho de "cancelar cualquier subasta emitida, independientemente de la etapa en que se encuentre, siempre que sea antes de formalizar el contrato o haber emitido una orden de compra".

También, la OAT fue caprichosamente arbitraria al asignar puntuaciones sin base racional alguna. Así, por ejemplo, levanta suspicacia el hecho de que en el criterio de amplitud o tamaño del terreno la OAT otorgó una

puntuación de diez (10) a Maranello, mientras que otorgó ocho (8) puntos a STZ. Aunque Maranello obtuvo mejor puntuación, soy de la opinión que la puntuación otorgada a STZ no encuentra lógica ni justificación que sostenga una mera diferencia de dos (2) puntos, cuando la propuesta de Maranello ofrece catorce punto cincuenta y seis (14.56) cuerdas de terreno con un espacio de expansión de cinco punto veintisiete (5.27) cuerdas; mientras que STZ ofrece cuatro punto cero una (4.01) cuerdas con un espacio de expansión de cero (0) cuerdas. Sobre este particular debemos recordar que uno de los factores dentro del criterio o amplitud o tamaño del terreno era la posibilidad de expansión futura. STZ se limitó a explicar que para una futura expansión del Centro Judicial de Aibonito podría construirse un piso adicional en el edificio.

En otras palabras, la cabida de la propiedad ofrecida por STZ solamente equivale a un veinte por ciento (20%) de la cabida de la propiedad de Maranello. No obstante, la diferencia en la escala de avalúo es de solamente dos (2) puntos. Aun si descartamos el requisito de espacio adicional para expansión dispuesto en el *RFP*, un simple cálculo matemático niega la posibilidad de algún razonamiento que sostenga los ocho (8) puntos que la OAT concedió a STZ en el criterio de amplitud de terreno.

Sobre el particular, es importante señalar que Bird arguye que el Comité Evaluador fue arbitrario al asignar una

puntuación casi perfecta a STZ en el renglón de "amplitud o tamaño del terreno". Surge del expediente que el terreno de STZ era uno de los más pequeños. De igual forma, en cuanto a la posibilidad de expansión -subfactor considerado en el criterio de amplitud-, STZ se limitó a señalar que el diseño estructural permitiría la construcción de un piso adicional. Sin embargo, obtuvo una puntuación casi perfecta -ocho (8) puntos- sin ni si quiera identificar las escaleras o elevadores que permitirían la expansión futura.

Por otro lado, STZ fue el proponente que mayor cantidad de puntos obtuvo en el criterio de "calidad y funcionalidad en el diseño y construcción". Sin embargo, su propuesta contiene el uso de hormigón postensado, el cual fue taxativamente prohibido en el *RFP*. No obstante, STZ llegó a ser el proponente que mayor puntación obtuvo en ese renglón -nueve (9) puntos.[99]

Estas situaciones se repiten en cada uno de los criterios evaluados por el Comité y con cada uno de los proponentes.

IV

Otra razón de gran peso que me mueve a disentir y que la mayoría de este Tribunal simplemente ignora, es el Informe de Auditoría del Contralor de Puerto Rico DA-12-52[100]

---

[99] Si bien es cierto que ofreció alternativas al uso de este material, no es menos cierto que no proveyó detalles respecto a estas alternativas.

[100] http://www.ocpr.gov.pr/informes_en_PDF/pdf_2011_2012/da/DA-12-52.pdf. Los siguientes son los hallazgos señalados por la Oficina del Contralor en el Informe de Auditoría DA-12-52:

y DA-12-53.[101] Estos Informes, revelan que la OAT ha tenido

serios señalamientos, especialmente en cuanto a los cánones

de arrendamiento del edificio de la OAT, el Tribunal de

Apelaciones y la construcción de la Sala de Relaciones de

Familia y Menores del Municipio de Bayamón.

Así, por ejemplo, la señora Contralora concluyó que los

edificios de la OAT y el TA  y sus estacionamientos están

---

1- Precontrato de arrendamiento de locales para el uso de la Rama Judicial otorgado a una corporación privada sin cumplir con el proceso de subasta según requerido por reglamento, y contrato relacionado con dicho arrendamiento otorgado sin proteger los intereses de la OAT.

2- Cánones estipulados en el contrato de arrendamiento de los edificios de la OAT y del TA que exceden las cantidades razonables que se pagan en el mercado.

3- Penalidades no impuestas a la Corporación por la entrega tardía del edificio para uso de la OAT.

4- Posibles conflictos de intereses de un funcionario de la Rama Judicial y un empleado de la firma de ingenieros a cargo de la Oficina de Inspección que representa a la OAT en la construcción de los edificios.

5- Incumplimiento de disposiciones de la Ley Núm. 18 y del Reglamento Núm. 33 relacionadas con el registro de los contratos en la Oficina del Contralor de Puerto Rico.

[101]http://www.ocpr.gov.pr/informes_en_PDF/pdf_2011_2012/da/DA-12-53.pdf. Los siguientes son los hallazgos señalados por la Oficina del Contralor en el Informe de Auditoría DA-12-53:

1- Posibles situaciones irregulares en el arrendamiento de los edificios de las salas de Relaciones de Familia y de Asuntos de Menores de Bayamón, y de estacionamientos.

2- Cánones estipulados en el contrato de arrendamiento del edificio de estacionamientos de la SRFM que exceden cantidades razonables que se pagan en el mercado.

3- Deficiencias relacionadas con el Contrato de Arrendamiento en el Registro de la Propiedad y la inscripción de este.

4- Deficiencias relacionadas con la construcción y el arrendamiento de un edificio para el Departamento de Justicia dentro de los terrenos cedidos en arrendamiento a la OAT.

5- Posible conflicto de intereses del Ingeniero a cargo de la Oficina de Inspección que representaba a la OAT en la construcción de los edificios de las SRFM y de estacionamientos.

6- Deficiencias relacionadas con las actas de las reuniones realizadas durante el proceso de construcción de los edificios de las SRFM y de estacionamientos.

alquilados por un canon de arrendamiento muy por encima de lo que se paga en el mercado por espacios de alquiler en edificios similares. A estos efectos, la Oficina del Contralor, mediante un perito cualificado como Ingeniero Civil y Tasador, preparó la siguiente tabla comparativa de cánones de arrendamiento de edificios utilizados como comparables:[102]

| Localización | Área Rentable | Cantidad de estacionamientos cedidos por cada 1,000 pies cuadrados de AR | Renta Básica | CAM[103] por pie cuadrado | Cargo por cada estacio-namiento adicional a los incluidos en la renta básica |
|---|---|---|---|---|---|
| San Patricio, Guaynabo | 207,823 | 4 | $22.00 | $7.97 | $80 |
| Calle San Roberto, Río Piedras | 73,030 | 4.1 | $21.00 | $10.00 | Incluidos |
| Calle Chardón, Hato Rey | 209,488 | 4.5 | $19.50 | $8.42 | $85 a $125 |
| Ave. Los Romeros, Motehiedra San Juan | 177,880 | 4.9 | $19.00 | $8.52 | $55 a $75 |
| Ave. Ponce de León, Hato Rey | 8,368 | 4.42 | $19.00 | $8.00 | $60 |

El Informe indica que al considerar la calidad de la construcción y las terminaciones interiores de los edificios

---

[102] Oficina del Contralor, *Informe de Auditoría DA-12-52*, 19 de marzo de 2012.

[103] *Common Area Maintenance* son los gastos que se distribuyen entre los inquilinos para el mantenimiento del edificio. Esta cifra es por pie cuadrado de alquiler anual y típicamente se dividen en gastos por utilidades de uso común y gastos operacionales.

de la OAT y del Tribunal de Apelaciones, la renta debería estar en el límite inferior de diecinueve dólares ($19.00) por pie cuadrado. Peor aun, en cuanto a la renta del estacionamiento, la Contralora indicó que mensualmente se paga cuatrocientos siete mil ochocientos ocho dólares **($407,808)** mientras que el **precio del mercado** es de una renta mensual de ochenta y ocho mil quinientos dólares **($88,500)**; esta renta cubre el uso de setecientos ocho (708) estacionamientos. Según estos datos, **el costo mensual por cada estacionamiento para cada empleado asciende a quinientos setenta y seis dólares mensuales ($576); mientras que en los edificios comparables se paga una renta de estacionamiento ascendente a ciento veinticinco dólares ($125) mensuales.** Según la Contralora, esta contratación le conlleva al erario un pago de rentas en exceso de cerca de tres millones ochocientos treinta y un mil seiscientos noventa y seis dólares **($3,831,696) anuales.**[104]

En fin, según el Informe, **la OAT terminará pagando cerca de doscientos dieciocho millones trescientos treinta y dos mil ciento veintisiete dólares ($218,332,127), en exceso del canon de una renta razonable durante el término del**

---

[104] Oficina del Contralor, Informe de Auditoría DA-12-52, 19 de marzo de 2012, pág. 27. Según la Oficina del Contralor, el banco que proveyó financiamiento del proyecto solicitó una tasación. En la tasación presentada al banco se expresó que el arrendamiento negociado entre la OAT y el desarrollador era mayor al valor de alquiler de espacios de oficina en el área metropolitana. *Íd.*, pág. 28.

Asimismo, la Contralora reveló en su Informe que la Oficina de Auditoría Fiscal de la OAT recomendó no suscribir el contrato con el desarrollador. *Íd.*, págs. 16-17, 28. En cambio, favoreció una propuesta sometida por la Autoridad de Edificios Públicos. *Íd.*, pág. 28.

**Contrato que asciende a treinta (30) años.** Consecuentemente, la Oficina del Contralor advirtió a los administradores de la Rama Judicial de los efectos adversos al presupuesto de la Rama Judicial y al Presupuesto del Gobierno de Puerto Rico. Más aun, advirtió que como corolario de la sana administración pública, la Directora Administrativa de los Tribunales **debió solicitar un estudio o evaluación de rentas prevalecientes en el mercado para edificios comparables.**

Señalamientos análogos se encuentran en el Informe de Auditoría DA-12-53 de 19 de marzo de 2012. En esta ocasión, los señalamientos están relacionados con la construcción de la Sala de Relaciones de Familia y Asuntos de Menores del municipio de Bayamón. Específicamente, la Oficina del Contralor indicó que en virtud del Contrato de Diseño, Construcción, Financiamiento y Arrendamiento, la renta anual de trescientos veinticuatro **(324)** unidades de estacionamientos asciende a seiscientos cincuenta y cuatro dólares con trece centavos **($654.13)** pagaderos mensualmente por cada unidad de estacionamiento.[105] Esto representa un total de sesenta y ocho millones noventa y nueve mil ochocientos setenta y cinco dólares **($68,099,875) pagados en exceso del canon de una renta razonables durante el término de treinta (30) años del Contrato.**[106]

---

[105] Oficina del Contralor, Informe de Auditoría DA-12-53, 19 de marzo de 2012, págs. 30-33.

[106] *Íd.*, pág. 32. Esta auditoría también revela que una Jueza Superior asignada a la Sala de Relaciones de Familia de Bayamón participó en la toma de decisiones que condujeron al otorgamiento de los contratos concernidos. *Íd.*, pág. 17. A su vez, la Jueza Superior, Hon. Raquel Irlanda Blassini, era representante, codueña y hermana del Presidente

En vista de que la Oficina del Contralor realizó estos **serios señalamientos** acerca del arrendamiento de los edificios de la OAT, del Tribunal de Apelaciones, la Sala de Relaciones de Familia y Asuntos de Menores y considerando que este es el mismo tipo de contratación que se pretende realizar en el Centro Judicial de Aibonito, la OAT debió cancelar la subasta. El curso de acción responsable hubiese sido detener la contratación para estudiar la razón de estos costos excesivamente elevados. Es decir, la administración de la Rama Judicial debió solicitar un estudio de los precios de la renta en el mercado para edificios comparables a la fecha de la negociación para asegurarse de la razonabilidad del canon de arrendamiento.

Por otro lado, el Comité Evaluador y la mayoría de este Tribunal reconocen que la propuesta de STZ fue desfavorecida en el criterio de costo de arrendamiento. No obstante, validan la otorgación de esta propuesta a STZ fundamentándose en su alegada superioridad en otros criterios de evaluación. Sin embargo, el análisis de este Tribunal no debe girar en torno a si la propuesta es superior porque provee diferentes edificios y estacionamiento techado, sino que debió girar en torno a si es sana administración pública la erogación de fondos para pagar un arrendamiento en exceso de una cantidad razonable

de la Corporación con la que la OAT, entonces representada por la Hon. Mercedes Marrero de Bauermeister, otorgó un precontrato de arrendamiento. Aunque el contrato de arrendamiento fue posteriormente cedido a otra corporación, el Informe del Contralor consigna que estos actos evidencian que los intereses de la OAT no estuvieron protegidos. *Íd.*, págs. 27-28.

del valor en el mercado. Después de todo, ¿no es el propósito principal de las subastas el adquirir bienes y servicios al menor costo posible? Las expresiones de la mayoría de este Tribunal otorgan gran flexibilidad en este aspecto -con lo cual, *prima facie*, estoy de acuerdo pues no existe una regla inflexible al respecto. Empero, ¿cuál es el límite? Me temo que en esta ocasión la mayoría confunde este límite bajo la premisa de "discreción administrativa". Esa discreción quedó maculada, toda vez que no puedo confiar en un Comité Evaluador el cual -sin negar las cualificaciones personales de cada integrante- incluyó únicamente a dos (2) ingenieros quienes, en esencia, se hicieron cargo de la evaluación de unas propuestas para la otorgación de un contrato que requiere el dispendio de fondos públicos en cantidades astronómicas.

¿A la luz de qué teoría pretenden hacer caso omiso a los señalamientos de la Oficina del Contralor? ¿Acaso la Rama Judicial y sus administradores tienen licencia para desatender los hallazgos realizados por la Oficina del Contralor? Entonces ¿qué moral nos da legitimación para imponer nuestros criterios de sana administración cuando en nuestra casa reina todo lo contrario? ¿Ese es el ejemplo que queremos dar? Todas estas preguntas están latentes en mi conciencia y son las que me mueven a escribir en esta ocasión.

La administración de la Rama Judicial debe comenzar evaluando si verdaderamente, en virtud de la sana

administración, es conveniente otorgar Contrato de Diseño, Construcción, Financiamiento y Arrendamiento y cuánto podría ser la renta razonable en el mercado que ubica en Aibonito. Pero nada de esto ha ocurrido. El dinero que se está pagando en exceso mensualmente podría ser utilizado para resolver otras necesidades de la Rama Judicial. En lugar de ello, la OAT ha decidido pagar quinientos setenta y seis dólares ($576) por cada estacionamiento de la OAT y el Tribunal de Apelaciones; sin olvidarnos de los más de doscientos millones de dólares ($200,000,000) que pagará la Rama Judicial en exceso del canon de una renta razonable.[107]

Por último, estoy consciente de que se trata de edificios que albergan a los tribunales de este país, pero han sido desarrollados sin una planificación y la fiducia requerida para proteger los fondos de la Rama Judicial.

Por los fundamentos antes esbozados, no otorgaría el contrato a ninguno de los proponentes en el caso de autos. En lugar de ello, cancelaría la Subasta del caso de autos, de modo que la OAT regrese a la fase de planificación y ausculte, en primer lugar, si es verdaderamente conveniente otorgar un Contrato de Diseño, Construcción, Financiamiento y Arrendamiento; y en segundo lugar, como corolario de la sana administración, debe obtener varias opiniones profesionales fundamentadas en relación a cuál sería el

---

[107] No deja de asombrarme el hecho de que la Rama Judicial paga quinientos setenta y seis dólares ($576) mensuales por estos estacionamientos mientras que en el Viejo San Juan –donde el espacio de estacionamiento es escaso- puede alquilarse por aproximadamente doscientos veinticinco dólares ($225).

costo razonable del desarrollo del nuevo Centro Judicial de Aibonito. No será hasta entonces cuando la OAT estará en posición de evaluar propuestas para el desarrollo de este proyecto según enmarcado en el principio de sana administración y de adquisición económica de bienes y servicios para el gobierno.

Hoy me siento terriblemente preocupada **pues esta Curia hace caso omiso** a los graves señalamientos de la Oficina del Contralor con relación a Subastas anteriores de la Rama Judicial. A su vez, no puedo avalar los distintos actos arbitrarios de la OAT en la contratación sobre el nuevo Centro Judicial de Aibonito. Pero más preocupante es que mis compañeros jueces hayan decidido *no* usar sus tinteros para detener las acciones claramente arbitrarias de la OAT. Desde este Tribunal se han aplicado los más altos estándares de sana administración a las otras ramas de nuestro gobierno. Sin embargo, hoy ha llegado el día de hacer lo propio con la Rama Judicial, a la que con tanto esmero servimos. El no hacerlo de la misma forma, comunica el mensaje equivocado: ante alegaciones y actos arbitrarios de la Rama Ejecutiva, por ejemplo, este Tribunal es muy estricto y poco deferente, mientras que con las acciones arbitrarias del brazo administrativo de la Rama Judicial, somos en extremo deferentes.

No puedo prestar mi voto para eso. Desde que llegué a la Rama Judicial he sostenido que los jueces estamos sometidos a iguales reglas y escrutinio público al cual

están constantemente sometidos los servidores de las ramas políticas. Sin embargo, con la Sentencia que antecede, parecería ser que quienes realizan Contratos con la Rama Judicial, deben estar dispuestos a que este Tribunal no les provea un remedio efectivo frente a los actos arbitrarios de la OAT y la Rama Judicial.

V

Por los fundamentos antes expuestos, disiento respetuosamente de la Sentencia emitida por el Tribunal. En consecuencia, revocaría la Sentencia emitida por el Tribunal de Apelaciones y, en cambio, ordenaría la cancelación del proceso de negociación del proyecto de construcción del nuevo Centro Judicial de Aibonito.

Mildred G. Pabón Charneco
Jueza Asociada